**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

LINDA M. MARTIN et al.,

           Plaintiffs,

v.

UNKNOWN U.S. MARSHALS, et al.,

           Defendants.

Civil Action No. 10-0066 (PGS)

**OPINION**

Before the Court are Motions for Summary Judgment brought by four groups of defendants referred to in this opinion as the Federal Defendants, the Camden City Defendants, the Camden County Defendants, and the Camden County Prosecutor's Office Defendants (collectively, "Defendants"). This suit arises out of events that occurred primarily on the morning of January 8, 2008, when deputized members of the United States Marshals Service visited the home of Linda Martin in Camden, New Jersey in search of her son, Phillip Martin, who died within minutes of the Marshals' arrival from a gunshot wound to his head. The relevant authorities, including the Defendants, maintain that Phillip died from a self-inflicted gunshot wound, while Plaintiffs claim that one of the United States Marshals shot Phillip and that the rest of the Defendants participated in a conspiracy to cover up the shooting, thereby violating several rights secured by the United States and New Jersey Constitutions, and subjecting plaintiffs to common law torts. The Court has reviewed the record, and held oral argument on February 26, 2013, and for the reasons that follow, Defendants' motions for summary

judgment are granted in part and denied in part; only Plaintiffs' narrow claims under Counts Three and Four regarding the unlawful detention of Linda and Dwayne Martin by certain of the Defendants after Phillip's death survive the motions.

## BACKGROUND

### A.      The Parties

This Complaint[1] is brought by Plaintiffs for claims arising out of the death of Phillip Martin on January 8, 2008.  Plaintiffs are: Linda Martin, Phillip Martin's mother who brings claims on her own behalf as well as in her role as administratrix of Phillip Martin's estate; Dwayne Martin, Phillip Martin's younger brother; Phillip Corey Clax, Phillip Martin's eldest surviving son; and Bryhem Clax, Phillip Martin's youngest surviving son (collectively, "Plaintiffs").

Defendants Kevin Cunane, Christopher Leone, Barrett Johnson, John Hunsinger, Timothy O'Brien and Jerome Scott were all working as deputized members of the United States Marshals Service New York/New Jersey Regional Fugitive Task Force on the day of the incident at issue in this lawsuit, and as such they are referred to herein as the "Federal Defendants" or "Marshals".[2]   The Camden County Board of Chosen

---

[1] All references to Plaintiffs' Complaint are to Plaintiffs' Second Amended Complaint (docket no. 40) filed March 10, 2011.

[2] This opinion refers to these defendants as "Federal Defendants" or "Marshals" because all of the Federal Defendants had been deputized as members of the United States Marshals Service New York/New Jersey Regional Fugitive Task Force (the "Fugitive Task Force").  None of them, however, were a USMS employee.  Leone was a lieutenant with the NJ State Police.  See Bober Decl. Ex. T (Leone Depo.) at 6:14-17 (references to the "Bober Decl." are to the December 17, 2012, Declaration of David Bober, filed in support of the Federal Defendants' Motion For Summary Judgment (docket no. 120-5)).  Johnson and O'Brien (who is now retired) were sergeants with the Gloucester County Prosecutor's Office.  See Bober Decl. Ex. U (Johnson Depo.) at 16:13-18; id. Ex. AA (O'Brien Depo.) at 7:8-14.  Hunsinger was employed by the Camden County Prosecutor's Office.  See id. Ex. BB (Hunsinger Depo.) at 5:6-11.  Cunane was assigned to the fugitive unit of the Camden County Sheriff's Department.  See Cunane Depo.  7:12-8:10.  Fallon and Scott, who were not deposed, were employed, respectively, by the New Jersey State Police and the New Jersey State Department of Corrections.  See Brief in Support of Federal Defendants' Motion For Summary Judgment (Docket No. 120-4) at 1 n.1.  In addition, Plaintiffs originally named Ed Fallon in their

2

Freeholders,[3] Camden County Medical Examiner Gerald Feigin, M.D. ("defendant Feigin" or "Dr. Feigin") and Camden County Medical Examiner investigator Patrick Daley are referred to herein as "Camden County Defendants."  William Wiley,[4] Wayne Matthews, Keith James, and James Phillips were all working for the Camden City Police Department on January 8, 2008, and are collectively referred to herein as the "Camden City Defendants."[5]  John Ellis and Gary McBride, employees of the Camden County Prosecutor's Office, are referred to herein as "Camden County Prosecutor's Office Defendants".[6]

The Complaint asserts various constitutional and state law causes of action against the different groups of defendants.  As already stated, the claims arise from the death of Phillip Martin on January 8, 2008.  That morning, members of the Fugitive Task

---

Complaint, but the claims against Fallon have been voluntarily withdrawn.  *See* Plaintiffs' Memorandum of Law in Opposition to Federal Defendants' Motion for Summary Judgment (docket no. 134) at 4.

[3] Camden County Board of Chosen Freeholders is named as a defendant, in part, in its alleged capacity as "the employer of non-federal personnel, defendants John Ellis, John Greer, Gary McBride."  *See* Am. Compl.  Camden County Board of Chosen Freeholders under the circumstances alleged in this case, is an entity separate and apart from the County of Camden under *Wright v. State of New Jersey*, 169 N.J. 422 (2001).  Ellis, Greer and McBride are not Camden County Defendants.  Ellis, Greer and Mcbride are all separately represented in this action by counsel for the Camden County Prosecutor's Office.

[4] Plaintiffs originally identified Wiley as a "Federal Defendant", and later added him as a "Camden City Defendant."  *See* Docket No. 136 at nn. 1&2.  It appears that William Wiley was an employee of the City of Camden and was assigned to the Federal Fugitive Task Force on January 8, 2008. This decision refers to him as a Camden City Defendant because he is being represented by counsel for the other Camden City Defendants, and the claims asserted against him revolve around his role as a member of the City of Camden Police Department.

[5] Plaintiffs also originally asserted claims against Lt. Orlando Cuevas, Lt. Saponare, and Capt. Leone, all of which claims Plaintiffs have since withdrawn.  *See* Docket No. 136 at n.2.

[6] Plaintiffs also originally asserted claims against John Greer, which Plaintiffs have since withdrawn.  *See* Plaintiffs' Responses to Defendants John Ellis, John Greer and Gary McBride's Local Rule 56.1 Statement of Facts (docket no. 135-1) at ¶ 10.  In addition, in the Defendants' Statement of Material Facts filed with their summary judgment brief, it was noted that Ellis and McBride are employees of the Camden County Prosecutor's Office, which is a separate entity from the Camden County Board of Chosen Freeholders.  This statement was not challenged or opposed by Plaintiffs' statement of material facts or memorandum.

Force arrived at Linda Martin's home looking for her son, Phillip, in order to execute a warrant for his arrest. While they were in the home, one gunshot was fired, and Phillip Martin was later found dead in an upstairs bedroom. The relevant authorities at the time determined that Phillip Martin committed suicide by shooting himself in the head with a .38 caliber revolver. Plaintiffs now claim that one of the Marshalls shot and killed Phillip Martin and that the rest of the defendants were either negligent in performing their investigative duties or were engaged in a conspiracy, along with the Marshals, to cover up Phillip Martin's murder.

**B.      Events of January 8, 2008**

As of January 2008, there were at least three outstanding warrants for the arrest of Phillip Martin: in June 2007, Roanoke City General District Court, a state court in Virginia, issued a warrant for Mr. Martin's arrest for misdemeanor assault and battery; in August 2007, Roanoke City Circuit Court, another Virginia state court, issued a warrant for Martin's arrest for failing to appear on charges of eluding police and possession of a firearm by a convicted felon; and in October 2007, the Virginia Department of Probation and Parole issued an arrest warrant for Phillip Martin for parole violations related to his previous conviction for possession of cocaine with intent to distribute. *See* Bober Decl. Ex. A (Arrest Warrants). [7]

In December 2007, law enforcement authorities in Virginia requested assistance in locating Phillip Martin from the New York/New Jersey Regional Fugitive Task Force (the "Fugitive Task Force"), after an initial investigation indicated that Martin may have been residing with family in Camden. *See id.* Ex. A (Cunane Depo.) at 20:19-21; *see*

---

[7] Plaintiffs contend that some of these documents are "capiases", not "warrants." This contention is immaterial to the motions before the Court because the Plaintiffs admit, at least, that the documents at issue ordered the arrest of Phillip Martin.

*also id.* Ex. C (U.S. Marshals Report of Investigation dated December 13, 2007) (hereinafter "USMS 12/13/07 Report"); *id.* Ex. K (New Jersey State Police Fact Briefing Sheet).  In its report requesting assistance from the Fugitive Task Force, the Marshals Service indicated that it had been working with a confidential source who had recently received a call from Phillip, and had determined that the call had been made from a cell phone subscribed to by Phillip's brother, Dwayne Martin, who the Marshals Service said resided at 103 S. 35th Street in Camden.  *See* USMS Report.

Defendant Kevin Cunane, a member of the Fugitive Task Force, was assigned to locate and apprehend Martin.  *See* Cunane Depo. at 20:16-21; Bober Decl. Ex. D (U.S. Marshals Report of Investigation dated January 9, 2008) (hereinafter "USMS 1/9/08 Report").  Before attempting to locate Phillip Martin, Cunane accessed law enforcement databases, which indicated that Martin had an outstanding 1995 arrest warrant from Collingswood, New Jersey.  *See* Cunane Depo. 26:19-22.  The New Jersey warrant listed Phillip's address as 103 S. 35th Street in Camden, which matched the current address that the Marshals had been given for Phillip's brother Dwayne.  *See* Arrest Warrant; USMS 12/13/07 Report.  Cunane also accessed property records and motor vehicle records, which indicated that 103 S. 35th Street was owned by Phillip's mother Linda Martin, and that Linda and Dwaun Martin (another of Phillip's brothers) had listed that address as their address of record with the New Jersey Motor Vehicle Commission.  *See* Cunane Depo. 23:6-9; *see also* Bober Decl. Ex. E (documents from Cunane's investigative file). Cunane also obtained address information for other known associates of Phillip Martin, including a woman named Cherry Boyce.  *See id*.

On the morning of January 8, 2008, Cunane and the other members of the

Fugitive Task Force gathered to discuss the arrest targets for the day, including Phillip Martin. *See* Bober Decl. Ex. F (Cunane Interrogatories) at 4. The group was briefed about its intended targets. Before arriving at 103 S. 35th Street, the Marshals searched for Phillip Martin at the home of Cherry Boyce, who lived on Benson Street in Camden. *See* Cunane Depo. at 56:1-5; *id.* at 64:14-65:8. After the Marshals did not find Phillip at Boyce's home they proceeded to 103 S. 35th Street. *See* Leone Depo. 39:23-40:2. The Marshals arrived at 103 S. 35 Street at approximately 6:30 a.m. *See* Leone Depo. 31:14-17; Bober Decl. Ex. V (Linda Depo.) at 102:18-19.

Cunane was the lead U.S. Marshal for the assignment to arrest Phillip Martin; Cunane assigned operational positions for the other team members in the event that Phillip was present at any of the locations they visited. *See* Cunane Interrogatories at 4-5; *see also* Bober Decl. Ex. G (Arrest Team Task Force worksheet with team member assignments) (hereinafter "Arrest Worksheet"); Hunsinger Depo. 25:20-26:13.[8] Some members of the team were assigned to remain on the property's perimeter, and others were assigned to approach and enter the house.[9] It is undisputed that Defendants Barrett Johnson, John Hunsinger, and Tim O'Brien were assigned to the "search team" that would enter the home. Cunane was also in the group that entered the house, and was part of the "inside control team," whose job would typically be to remain on the first floor. *See* Cunane Interrogatories at 4-5; Arrest Worksheet; Hunsinger Depo. 26:5-8.

Cunane, Leone, Johnson, Hunsinger, and O'Brien approached the house, and Cunane knocked on the front door. *See* Cunane Interrogatories at 5; Bober Decl. Ex. H

---

[8] Chris Leone, who was a Sergeant, was the most senior officer in the team.

[9] The parties dispute the exact makeup of the two groups, but this dispute is immaterial to the resolution of Defendants' motions for summary judgment.

(Leone Interrogatories); Cunane Depo. 30:14-16; *id.* at 89:16-18; Leone Depo. 41:3-6; Hunsinger Depo. 28:4-6.   After "a few minutes," *see* Linda Depo. 109:20-110:1, Linda "slightly opened the door," *id.* at 113:21.

The parties dispute what exactly happened next.  The Federal Defendants say that Cunane asked Linda what her name was, and who was in the house with her.   Linda Depo. 132:4-10.  The Federal Defendants further contend that Linda Martin told Cunane her name and said that her sons Dwayne and Phillip were in the house, and that Phillip was upstairs.   *Id.* 132:11-13; Leone Depo. 45:3-5; Cunane Depo. 82:8-11.   In the Marshals' version, the Marshals only entered the home to search for Phillip Martin after being told by Linda that Phillip was in the house.  *See* Linda Depo. at 132:15-16.

Plaintiffs, citing only the January 15, 2013 Declaration of Linda Martin, which she submitted in support of Plaintiffs' opposition to Defendants' motions for summary judgment, contend that when Ms. Martin slightly opened the door to find out who was knocking, the Marshals burst into her home, with guns drawn.  *See* Linda Decl. ¶¶ 7-10. Plaintiffs say that the Marshals did not present any arrest warrant or search warrant to Ms. Martin or tell Ms. Martin why they were at her home.  *See id.*  Plaintiffs claim Ms. Martin, without telling them her name, told the Marshalls that she and her two sons were in the house and that Phillip was sleeping in a bedroom upstairs.  *See id.*

As the Marshals entered the house, Cunane motioned to Federal Defendant Barrett Johnson that Phillip was upstairs.  *See* Johnson Depo. 81:17-82:15.  Cunane and Leone remained on the first floor with Linda and Dwayne, who had been asleep on an air mattress on the living room floor when the Marshals arrived.  *See* Leone Depo. 45:7-

19.  Johnson, O'Brien, and Hunsinger (in that order) began to climb the stairs, which are located directly in front of the front door.  *See* Leone Depo. 45:5-7; Hunsinger Depo. 28:12-14; *id.* 28:17-19.  They went up the stairs "tactically," meaning they ascended slowly and methodically, with weapons drawn, trying to be "as quiet as possible."  *See* Johnson Depo. 83:15-84:20.  Johnson testified that as he ascended the stairs, he could see a doorway at the top of the stairs that led to a bathroom, and doorways at his one o'clock and three o'clock positions that led into bedrooms.  *See* Johnson Depo. 89-92.  There were no doors in the doorways, and no banister or railing at the top of the steps, apparently because of ongoing renovations.  *See* Hunsinger Depo. 29:1; *see also* Complaint ¶¶ 36-37 (noting that house had "no interior privacy doors" and no "retention banister" due to ongoing renovations).

Johnson stated that as he approached the top of the steps, he saw a black male, sitting on what Johnson believed to be a television console, with his head down, and holding a gun in his right hand between his legs.  *See* Johnson Depo. 114:21-115:3; Bober Decl. Ex. B (report of investigation signed by Johnson).  What happened next is subject to dispute by the parties.  It is undisputed that very soon or immediately after Johnson reached the top of the stairs he said the word "gun" and began to push the other agents down the steps.  *See* Johnson Depo. 111:22-112:2; *id.* 116:2-4; Hunsinger Depo. 29:4-10.  It is also undisputed that simultaneously or almost simultaneously, everyone in the house heard a gunshot.  *See* Johnson Depo. 120:13-14; Hunsinger Depo. 29:4-10; Dwayne Depo. 94-95; Linda Depo. 153-54.

The Plaintiffs point out that members of the law enforcement group present in the house that day have testified to slightly different depictions of the events immediately

before the gunshot was heard.  Cunane stated in his report that *all of the officers* made it to the top of the stairs and "witnessed Martin reaching for a handgun".  *See* Cunane Report.  U.S Marshals investigator Kenneth King's report contained similar information.  *See* Plaintiffs' Supplemental Concise Statement of Disputed Facts (hereinafter "SDF") ¶¶ 301-303.  The two key differences between Cunane's and King's depiction of the events and Defendants' current version of the facts are: (1) that in Cunane's and King's versions "all of the officers" made it to the top of the stairs and saw Phillip Martin, rather than the Federal Defendants' current depiction of the facts wherein just Johnson reached the top of the stairs; and (2) that Martin was not holding a gun at the time he was seen by law enforcement personnel but instead he was reaching for a gun at that time.  Plaintiffs also point out that while Johnson testified at a deposition that Phillip Martin raised his hand towards his head while holding the firearm, his report on January 8, 2008, does not state that, and Johnson could not explain why his deposition testimony is contradicted by his incident report.  *See* SDF ¶¶ 95-96; Exhibit P-13.  Finally, Plaintiffs point out that Hunsinger, who was one of the three officers that ascended the stairs towards Phillip Martin's room, testified he never saw Phillip Martin with a gun or reaching for a gun.  *See* SDF ¶ 363.  This last fact is actually consistent with what Defendants are claiming the undisputed facts are for the purposes of this summary judgment motion – that only Johnson reached the top of the stairs and witnessed Phillip Martin holding a gun.

As stated above, the parties agree that what happened next was that Johnson said the word, "gun" and simultaneously or nearly simultaneously a gunshot was heard.  At this stage in the litigation, there has been no evidence produced that anyone currently living saw this shot being fired.  The evidence presented by Defendants suggests that the

shot was fired by Phillip Martin.  Plaintiffs do not present any direct evidence that the shot was fired by anyone else, but they point to what they consider are inconsistencies in Defendants' evidence.

Defendants say that as Johnson said the word "gun", he began to push the other agents down the steps.  *See* Johnson Depo. 111:22-112:2; *id.* 116:2-4; Hunsinger Depo. 29:4-10.  Dwayne Marshall, one of the Plaintiffs, testified that he never lost sight of the Marshals (*see* Dwayne Depo. 95:5-18) was "looking up the steps" when he heard one gunshot (*id.* 96:8-12), and did not see any Marshal fire his gun (*id.* at 97:4-6; *see also* Bober Decl. Ex. GG (transcript of interview with Dwayne Martin dated January 8, 2008) (hereinafter "1/8/08 Dwayne Interview").[10]  Leone was wearing a microphone underneath his jacket that he could use to communicate with the officers who were outside the house. *See* Leone Depo. 53:21-24; *id.* 54:11-16.  Leone testified that he yelled "shots fired" into his microphone, positioned himself at the bottom of the stairs, and pointed his gun toward the top of the stairs to cover the three Marshals who were descending.  *See* Leone Depo. 53:21-24; *id.* 54:11-16.

When the Marshals reached the bottom of the stairs, Hunsinger and the other Marshals asked Johnson what had happened, and Johnson replied that he had seen a man with a gun, that the man was bringing the gun up towards his head, and that the man might have shot himself.  *See* Hunsinger Depo. 29:12-18; Leone Depo. 56:19-57:7.  The Marshals testified that they were unsure whether the individual with the gun had in fact shot himself, or whether he had been shooting at the Marshals or into the air, and also whether he was still armed and dangerous.  *See* Hunsinger Depo. 29:23-30:2; Leone

---

[10] For their part, Plaintiffs point out that Dwayne Martin testified that he could see certain parts of the body of the Marshals as they moved upstairs, but that he did not say he saw the Marshals at the point when he heard a gunshot.  *See* 1/8/08 Dwayne Interview.

Depo. 57:8-10.  Defendants Fallon and Scott, who were assigned to the perimeter, did not enter 103 S. 35th St. until after the gunshot had been fired.  Bober Decl. Ex. Q (Scott Interrogatories); *id.* Ex. R (Fallon Interrogatories).

The Marshals then called the Camden City Police Department to request assistance, and eventually members of what has variously been referred to as the Camden City Police Department Emergency Response Team ("ERT") or the "SWAT team", arrived on the scene.  *See* Leone Depo. 69:16- 70:17.  While they waited for the ERT to arrive, the Marshalls remained downstairs, and tried to establish contact with Martin, including by yelling up the stairs to him and by calling him on a cell phone number that was provided to them by Dwayne.  *See* Scott Interrogatories at 5; Dwayne Depo. 112:24-113:8; *see also* Leone Depo. 69:9-70:13.[11]

Camden City police officers began to arrive on the scene, in response to the "shots fired" radio call.  *See e.g.*, Scott Interrogatories at 5.  Then, upon the SWAT team's arrival, members of the team were advised that a gunshot had gone off on the second floor of the premises.  *See* Brief of Camden City Defendants in Support of Motion for Summary Judgment (hereinafter "Camden City Br.") Ex. B (Saponare Dep.) at 32:4-11.

Before any member of the SWAT team entered the premises, Linda Martin executed a "Consent to Search" form.  *See id.* at 38:7-13; *see also* Camden City Br. Ex. C (executed Consent to Search form) (hereinafter "Consent to Search").  At some point after the gunshot, the law enforcement officers in the Martin home had forced Linda and

---

[11] Although Plaintiffs "den[y] that any good faith effort was taken to contact Phillip Martin by Defendants," 56.1 Response to Fed. Def. (Docket No. 134-1), Dwayne Martin's own testimony belies that contention and Plaintiffs point to no evidence for their support.  *See* Dwayne Depo. 112:24-113:8 (Q: Were they calling upstairs? A: They asked him to come down.  Q: And were they calling more than once?  A: Yeah.  Q: Were they calling continuously throughout that half hour? A: For awhile.).

Dwayne to leave the house.  *See e.g.*, Cunane Depo. 72:12-73:3; Leone Depo. 54:2-3.
The circumstances of Linda and Dwayne's removal and of Linda's execution of the
Consent to Search form are in dispute and are addressed in more detail *infra*.

After repeated attempts to contact Phillip proved unsuccessful, the Marshals
ceded control of the situation to the SWAT team, and at approximately 7:30 a.m. the
SWAT team entered Phillip's bedroom.  *See* Bober Decl. Ex. I (Camden Police
Department Information Report dated January 8, 2008) & Ex. J (USMS Report of
Investigation dated January 8, 2008).  Officer Angel Ramos, who was carrying a
bulletproof shield, was the first officer up the stairs and into the bedroom.  *See* Ramos
Depo. 8:21-23; 9:7-13.  When Ramos entered the room he observed what he described as
"a black male kneeling down," which turned out to be the slumped over body of Phillip
Martin.  S*ee* Ramos Depo. 9:5.  Ramos also saw a handgun on the floor in "close
proximity to the body."  *See* Ramos Depo. 9:17-18

It was standard procedure for the SWAT team to render a handgun safe—*i.e.*, to
unload it—to protect against the possibility that an unknown person could be hiding
somewhere in the house and would try to use the gun against them.  *See* Pleskonko Depo.
14:20-15:4; *id.* at 16:6-15; Ramos Depo. 13:5-16.  In this matter, there has been no
evidence put forth that any particular officer made the gun found on the floor in Phillip
Martin's bedroom safe, but the gun was later found away from Phillip Martin's body on
the opposite side of the mattress on which Martin's body partially rested, with the bullets
removed and placed next to it.  Officer Ramos testified that he personally did not touch
the gun, and that he did not see and was not aware that any other member of the SWAT
team touched the gun; he also testified that if the gun had been touched, it would not have

been the subject of an incident report, but that someone would have told the commander that it had been touched.  Ramos Depo. 8:11-11:5.

Once the SWAT team determined that Phillip Martin was dead and that there was no one else in the house, they left, telling the Marshals on their way out that they had found a dead body upstairs.  *See* Leone Depo. 70:14-23.  At that point, with both Marshals and Camden City Police Department personnel in and around the house, crime scene investigators Ellis and McBride from the Camden County Prosecutor's Office entered the home and began to process the scene.  *See* Leone Depo. 71:8-24; O'Brien Depo. 39:24-47:2; *see also* Bober Decl. Ex. J (Report of Investigation dated January 8, 2008).  Ellis and McBride photographed and videotaped the scene and collected a variety of physical evidence, including a .38 Smith & Wesson revolver with a black knit cap taped tightly around the grip; a discharged, deformed bullet that had ricocheted around the room and landed on the floor close to Martin's body; a spent shell casing; and unfired live rounds that had been removed from the weapon.  *See* Bober Decl. Ex. L (Camden County Prosecutor's Office Evidence Submission Review and receipt).  Defendant Keith James of Camden County Police Department, who had arrived at 103 South 35th Street after the shooting, also took photographs.  *See* Bober Decl. Ex. H (Defendant Keith James' answers to interrogatories).

Phillip's body was removed by the Camden County Medical Examiner's Office, which performed an autopsy the next day, January 9, 2008.  *See* Bober Decl. Ex. O (autopsy report dated January 9, 2008).  Defendant Feigin conducted the post-mortem examination and autopsy at the Underwood Hospital Morgue.  *See* Post-Mortem Report,

Goldberg Decl., Exhibit B.[12]  Dr. Feigin concluded that the cause of decedent's death was "[g]unshot wound to head" and that the manner of death was "[s]uicide."  *See* Goldberg Decl., Exhibit B.

The medical examiner also determined that Phillip Martin's wound was a "contact wound," meaning that the muzzle of the gun was pressed against the head when the gun was fired.  *See id.*; *see also* Feigin Depo. 185-86.  The examiner determined that the bullet entered slightly above the right ear near the right temple, traveled from right to left and slightly upward, and exited at the left side of the skull, toward the back of the head. *See* Bober Decl. Ex. O (autopsy report).

Defendant Ellis's report for the Camden County Prosecutor's Office concluded that Phillip shot himself in the head at his right temple with the .38 Smith & Wesson that was recovered at the scene.  *See* Bober Decl. Ex. P (Camden County Prosecutor's Office, Summary Investigative Report).  The report describes the path of the bullet as exiting the left side of Phillip's head, striking a wall, ricocheting off another wall leaving behind hair and tissue splatter, and landing on the ground near Phillip where it was recovered.  These items were later provided to the New Jersey State Police Ballistics Laboratory, which determined that the casing that was recovered from the scene had been fired from the gun that was recovered at the scene, but that tests on the bullet were inconclusive.  *See* Bober Decl. Ex. M (New Jersey State Police Laboratory Report dated April 13, 2009).

Plaintiffs do not dispute that the Medical Examiner and Prosecutor's Office made the determinations that they did, but Plaintiffs assert that Dr. Feigin and the Camden County Prosecutor's office did not conduct "good faith, adequate and unbiased"

---

[12] References to the "Goldberg Decl." are to the November 30, 2012, Declaration of Howard L. Goldberg, filed in support of the Camden County Defendants' Motion For Summary Judgment (docket no. 116-2)

investigations and "deliberately failed to obtain significant material evidence . . . that would have shown that Phillip Martin's death was not suicidal."  *See* SDF ¶ 55; Pl. Opp. to Camden County Pros. Mot. Sum. J. (docket no. 135) at 4-5.  Plaintiffs' also submitted the reports of a forensic pathologist, forensic psychologist and forensic scientist, who have all raised certain issues with the Defendants' methods and conclusions.  See Pl. Opp. to Def. Mot. Sum. J., Exs. 103-105.

Plaintiffs' forensic science consultant, Gary Rini M.F.S., concluded that Phillip Martin's death was not a suicide.  Among other opinions offered by Rini, he says that Martin was on his knees at the time he sustained the fatal wound and that "suicide can be excluded as the manner of death" because "the scene was altered," there was no blood found on the .38 Smith & Wesson or on Phillip's hands, and Phillip's right hand "was discovered tucked in a bag beneath him and between his legs."  *See* Bober Decl. Ex. CC (expert report of Gary Rini).  Rini wrote: "there is no evidence documented or present that demonstrates that the decedent died as the result of a self inflicted gunshot wound." *Id.*

Pathologist Dr. Emily Wofford Ward says that "Dr. Feigin's determination that Mr. Martin's manner of death was a suicide is flawed."  She says that "[t]he wound that Dr. Feigin describes is more consistent with a .40 caliber (or larger) bullet than from a .38 caliber bullet."  Ward raises some questions about parts of the report that she finds confusing, and faults Dr. Feigin because his examination, both his written description and the attached photographs, were in her opinion unclear.  Dr. Ward concludes that "the manner of Mr. Martin's death was not the result of a self-inflicted contact wound to his head by a .38 caliber handgun."

Plaintiffs also submit the report of Dr. Manuel St. Martin, who conducted a "psychological autopsy." St. Martin concludes that Phillip might not have killed himself because he does not fit the profile of someone who would die by a self-inflicted gunshot wound during police confrontations and because he believes that there are inconsistencies in the police reports and autopsy reports that were created.

**Linda and Dwayne's Detention**

The facts surrounding Linda and Dwayne's detention after removal from their home are in dispute. In sum, the Defendants all disclaim involvement with Linda and Dwayne's transportation to the police department for questioning, although it seems that Defendants do not deny that the Martins were removed from their home, detained in a vehicle, and somehow transported to the Camden City police station where they were eventually questioned by law enforcement officers including Defendant Investigator Gary McBride of the Camden County Prosecutor's Office and Defendant Wayne Matthews of the Camden City Police. Plaintiffs assert that they were detained and transported in a Camden Police Department vehicle after they were forcibly removed from their home in night clothes, transported to Camden Police Department, and interrogated inside a secured room, all against their will and in spite of their protestations.

Cunane testified that immediately after the gunshot was heard he told Dwayne to stay where he was. Cunane Depo. 73:14-19. Cunane testified that at some point he "removed" Linda and Dwayne from the home. The testimony adduced in discovery suggests that Linda Martin's forcible removal from the home happened almost immediately after the gunshot was fired; Leone testified that as the Marshals who had ascended the steps rapidly descended after the gunshot was heard, "Kevin [Cunane] was

moving Mrs. Martin out towards the front door." *See* Leone Depo. 53:24-54:3.  Cunane himself testified that he "pushed [Linda] out the front door."  Cunane Depo. 72:12-73:3. However, the evidence is not clear as to exactly what happened after Linda Martin was pushed out the door.  Cunane testified that he removed Linda for her safety, and that he was aware that after he pushed her out the front door she was placed in a vehicle, although due to the chaotic nature of the time-period after the gunshot was heard Cunane did not know who placed Linda in the vehicle or whose vehicle it was.  *Id.* 70:17-71:9.

Linda Martin testified that Camden City police officers "pulled" her out of the house, and "dragged" her across the street while she was barefoot and in her pajamas and eventually forced her into a police car.  Linda Depo. 175:6-178:5.  She said that the officer who put her in the car did so without explanation and then sat down in the front seat and did not respond to Linda Martin's questions.  *Id.* 174:11-175:5.  Linda Martin then sat in the police car and witnessed the SWAT team arrive and later bringe her son Dwayne out of the house in handcuffs.  *Id.* 178:20-179:4.

Dwayne, for unexplained reasons, was allowed to remain in the home longer than his mother, albeit under the close supervision of the Marshals.  *See, e.g.*, Dwayne Depo. 112:7-11.  Dwayne said about the circumstances of his leaving the house: "they just asked me to leave and I left."  *Id.* 112:20-23.  Cunane testified that he "removed Dwayne from the house" and that he then "handed [him] off to a Camden City Police Officer who had arrived on the scene."  Cunane Depo. 72:12-73:4-7.  As he walked out the front door, he was handcuffed and placed into the Camden City police car where his mother was already sitting.  Dwayne Depo. 113:10-12.

17

Ms. Martin testified that as she sat in the car, before Dwayne was brought to join her, Defendant Wiley of the Camden City Police presented her with a "Consent to Search" form in which the operative fields that are meant to be completed were blank. When Linda Martin refused to sign the "blank" form, the police officers who presented it to her filled it out with pertinent information.   Linda Depo. 180:3-183:14.   Linda Martin said that she was forced to sign the form, and did not read it before signing it.   *Id.* 183:16-184:2.   Ms. Martin also testified that the doors were locked during the duration of her time in the police car.   *Id.* 186:21-23.   At one point, Linda asked Officer Wiley and another officer whether she could get clothes, shoes, and a handbag from the house, which the officers disallowed without explanation.  *Id.* 189:15-20.

Eventually, Linda and Dwayne were driven to the Camden City Police Station by the uniformed police officer who had been sitting in the front seat of the car the whole time.   *See* Dwayne Depo. 113:10-12; Linda Depo. 193:18-194:4.   Linda recalled that when they arrived at the station, the police officer who drove her told another officer who had been at Linda Martin's home earlier and who was entering the police station at the same time that he "ha[d] the mother here and she's not cooperative."   Linda Depo. 196:17-197:18.

At the station, Linda and Dwayne were taken to separate places.  The officer driving the car took Dwayne downstairs separate from his mother and handcuffed him to a wall in what Dwayne called "a holding cell."  *Id.* 113:13-114:3.   According to Dwayne, he was not told why he was being held, and he remained there handcuffed to the wall in a locked holding cell for what he remembered as forty-five minutes, which is probably relatively accurate given the timeline.  *Id.* 114:15-115:13.   Linda was in a separate room.

She was not handcuffed, nor was the door locked, but she was told she could not leave. *Id.* 194:18-195:21;199:16-200:7.   At one point she freely left the room to use the bathroom, and she was allowed to use someone's phone to call her mother, but she was made to continue to wait alone in a room despite her requests to be allowed to leave.  *Id.* 205:3.

Eventually, Dwayne's handcuffs were removed, he was allowed to use the bathroom, and then he was taken to what he called a "conference room" where he rejoined his mother who was sitting at a table.  *Id.* 117:2-118:3.  There also were law enforcement officers in the conference room at that time; it was in that room that Linda and Dwayne were told that Phillip had committed suicide.  *Id.* 121:9-17.  While they were in the conference room together, Linda asked to leave and was told by one of the people in a suit that she could not leave at that time.  *Id.* 131:21-132:10.

Linda and Dwayne were each interviewed separately by Defendants McBride and Matthews, which interviews were recorded and transcribed.  The recorded portions of the interviews lasted seven minutes (Dwayne) and eleven minutes (Linda), although as all of the undisputed evidence makes clear the Plaintiffs spent more time at the police station than it took to conduct the interviews.   During her interview, Linda Martin clearly expresses her desire to go home.  McBride tells her that she is not being forced to remain at the police station, but the record reflects that he did not take any steps to make sure she was allowed to leave.  Eventually, a police officer drove Linda and Dwayne home.

### Plaintiffs' March 23, 2008 Letter

The Plaintiffs sent a letter on March 23, 2008 to Camden City Police Chief Edward Harges.  *See* Pl. Opp. to Mot. Sum. J., Ex. 87.  In the "cc" field, Plaintiffs' letter

lists 11 additional state and local recipients, including Governor Corzine and various other government officials.   Plaintiffs also claim that other officials, including Chris Christie in his role as United States Attorney, received the letter as evidence by certified mail receipts indicating that something, although it is not clear what, was mailed to Christie and the others.   *See* Pl. Opp. to Mot. Sum. J., Ex. 109 (docket no. 134-12).   In the letter, Linda Martin complains about the events of January 8, 2008.   Ms. Martin says U.S. Marshals went to her home and "caus[ed] [her] son to take his life", although she also says that "[f]rom their actions, it appears to Phillip's family and friends that the Marshals came with the sole intent to kill him."   Linda Martin complains about the actions of the law enforcement officers on the morning in question, faulting the Marshals for their sudden entrance and their failure to use less forceful means to get Phillip Martin to come downstairs, and she faults the Marshals and other officers for the way they treated her and Dwayne in the aftermath of the gunshot being heard.   In the letter, Plaintiffs do not ask for any specific relief, nor do they threaten suit or make a claim for money damages. Instead the letter seems to be asking for answers to Linda Martin's questions.   It is not clear what action, if any, Defendants took in response to the letter, but it is undisputed that none of the Defendants responded to the letter, although there is a dispute as to whether all of the Defendants received the letter.

The record reflects that the ballistic work performed on the gun found in Phillip Martin's room was not ordered until April 2008, which was after Plaintiffs sent the letter.

**The Complaint**

Plaintiffs, proceeding *pro se*, initiated this action by filing a complaint on January 6, 2010, alleging that they had "reason to believe" that the Marshals and Camden City

20

Police "entered [their] home without a search warrant and without invitation [and] did cause [Phillip Martin]'s death."  *See* Complaint dated January 6, 2010 (docket no. 1). Plaintiffs then retained counsel and filed two amended complaints.  The operative pleading is thus the Second Amended Complaint (docket no. 40), which contains seven causes of action.  Count V, which alleged that Camden County Prosecutor Warren Faulk is liable to Plaintiffs for failing to properly train and supervise his employees in the areas of crime scene investigations, was previously dismissed by order of Judge Garrett Brown for failing to state a claim upon which relief can be granted.  *See* Docket Nos. 36, 37. The remaining Defendants did not file motions to dismiss, and instead each moved for summary judgment in November and December, 2012, after extensive discovery was taken.

**DISCUSSION**

**I.      Legal Standard for Summary Judgment**

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (a).  Concomitantly, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citations omitted).  Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*; *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).  To that end, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Factual

disputes that are irrelevant or unnecessary will not be counted." *Id.*

In *Celotex Corp. V Catrett*, 477 U.S. 317 (1986) the, court noted:

> In our view, the plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Id***.** at 322.   Once the moving party has established the absence of a genuine issue of

material fact, the party opposing the motion "must do more than simply show some

metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp*., 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986)(holding that the party opposing the motion must present evidence which is

not merely "colorable" but which is "significantly probative.").

## II.     The Claims

Six causes of action remain in this lawsuit.  Count One, subtitled "4th Amendment

Violations by the above listed USMS agents," alleges that the Federal Defendants are

liable to Plaintiffs for violating their 4th Amendment rights and alleges a conspiracy and

cover-up by the agents.

Count Two, subtitled "14th Amendment Equal Protection Violation," alleges that

the "above listed law enforcement officers from Camden County, and [the Camden City

Police Department]" are liable under 42 U.S.C. § 1983 for violating Plaintiffs' 14th

Amendment equal protections and/or due process rights, and that Defendant Dr. Feigin is

liable to the decedent's estate for violating his 14th amendment equal protection rights by

discriminating against Phillip Martin on the basis of his race, as evidenced by the

"deficient autopsy report and manner of death conclusion."

Count Three, subtitled "4th Amendment Violations by state actors," alleges that the "above listed law enforcement officers of Camden County and the [Camden City Police Department]" are liable under 42 U.S.C. § 1983 for violating Plaintiffs' 4th Amendment rights through their "unlawful acts."

Count Four, subtitled "Violations of the New Jersey Civil Rights Act," alleges that the "above listed law enforcement officers of Camden County and the [Camden City Police Department" are liable under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, et seq., "because of [their] unlawful actions," and that Dr. Feigin is liable under the CRA "because of his sub-standard work and discriminatory intent."

Count Six, subtitled "Violations of NJ Constitution, Article I, Section 7," alleges that "defendants" are liable to the estate of Phillip Martin for excessive use of force and to Linda and Dwayne Martin for "unlawfully entering and searching the family home; for unlawfully arresting them; and for their unlawful false imprisonment," all in violation of the New Jersey Constitution.

Count Seven, subtitled "Common Law Wrongful Death and Survival Action," alleges that "defendants" breached their duty to the decedent to use reasonable efforts in the conduct of their official duties to avoid unnecessary harm to him thus causing his death, and as a result defendants are liable to Phillip Martin's estate and to his beneficiaries.

The Plaintiffs seek, among other things: a declaratory judgment that Phillip Martin's death was not a suicide, and that Defendants' actions violated Plaintiffs' rights under the Constitution and state and federal statutes; (2) an injunction that will mandate

institutional changes to require defendants to provide training to officers in the are of crime scene investigations involving claims of death through suicide; and (3) an award of compensatory and punitive damages.

The claims in the Second Amended Complaint suffer from vagueness and ambiguity that make it difficult to ascertain what the factual basis for the claims are as well as which defendants they are directed at. A plain reading the claims in the Second Amended Complaint would suggest that Count One is directed only at the Federal Defendants, Count Two is directed at the Camden City Defendants, Camden County Defendants, and to Dr. Feigin, Count Three is directed to the Camden City and Camden County Defendants, Count Four is directed to the Camden City and Camden County Defendants, as well as to Dr. Feigin, Count Six is directed to the Federal, Camden City, and Camden County Defendants, and Count Seven is directed to all Defendants. However, in Plaintiffs' opposition to Defendants' motions for summary judgment, Plaintiffs asserted that some of the claims which do not on their faces appear to be directed at certain defendants in fact are, and that certain claims which on their face appear to address particular factual allegations actually address additional or alternative factual allegations. This mid-stream clarification of the claims is ordinarily improper. However, this opinion addresses the full breadth of Plaintiffs' claims as set forth in the Second Amended Complaint as well as in Plaintiffs' opposition to the motions for summary judgment, and finds that only a narrow subset of Plaintiffs' claims survive summary judgment, which are the 4th Amendment claims in Count Three related to Linda and Dwayne's detention after the gunshot and asserted by way of § 1983.

### III.    Count One: 4th Amendment Violations by the Federal Defendants

Subsumed within Count One are several different theories of liability rooted in Plaintiffs' right to be free from unlawful searches and seizures as bestowed by the 4th Amendment to the U.S. Constitution.  Plaintiffs' main allegation in Count One is that one of the US Marshals shot Phillip Martin and thereby violated his 4th Amendment right to be free from excessive force.  However, also under Count One, Plaintiffs allege that the US Marshals used excessive force by drawing their weapons and in the manner they approached Phillip Martin on the morning in question.  In addition, under Count One the Plaintiffs allege that the US Marshals violated Plaintiffs' 4th Amendment rights by entering the Martin home, and by detaining Linda and Dwayne Martin after the gunshot rang out as the Marshals ascended the stairs towards Phillip Martin's bedroom.

In analyzing these allegations and all the constitutional violations alleged by Plaintiffs, the Court considers whether Defendants are entitled to qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *See Pearson v. Callahan*, -- U.S.--, 129 S.Ct. 808 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts first examine if "the facts alleged show the officer's conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This is where most of the analysis ends in this case.  However, if a court finds that a right has been violated, then courts inquire whether the right that was violated "was clearly established," or, stated differently, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir.

2007)(quoting *Saucier*, 533 U.S. at 202).  In ruling on Defendants' motions for summary judgment, the Court's analysis begins with the question of whether any constitutional rights have been violated.

A.      **Unjustified Shooting**

The Court will first address the Plaintiffs' theories of liability that are predicated on the first set of factual allegations – i.e., the allegations that one of the Federal Defendants killed Phillip Martin.  Plaintiffs allege, in essence, that Phillip Martin was murdered.  As explained below, the Court finds that there is no evidence to support the allegations of a shooting by one of the Marshals, that Plaintiffs' broad allegations of a "conspiracy" or cover-up do not change that, and instead, the admissible evidence points to the only plausible conclusion: that Phillip Martin committed suicide as the Marshals closed in to arrest him.

The most important testimony on this issue is that of Dwayne Martin.  Dwayne testified that (1) he was in the living room as the Marshals ascended the stairs, (2) he could see the Marshals – "their full body from their head to their toes" – as they climbed the stairs, (3) the Marshals never left the stairs, (4) they were never out of his sight, (5) he heard one gunshot, and (6) he did not see any Marshal fire his gun.  *See* Dwayne Depo. 94:24-97:6.[13]  This testimony, with absolutely no admissible testimony to contradict it, is

_____

[13] The deposition transcript reads as follows:

Q: From where you were sitting, could you see the Marshals Agents on the stairs?
A: Yes.
Q: What part of them could you see?
A: The back.
Q: Okay. Could you see their full body from their head to their toes?
A: Yes.
Q: All of them?
A: Yes.
Q: And did they ever disappear from your view?

sufficient to resolve the excessive force (*i.e.*, murder) claim against the Marshals.  The Marshals all agree that they either never made it off the stairs or, at most, made it to the landing at the top and turned around immediately. *See* Johnson Depo. 110:2-13 ("never made it to the landing"); O'Brien Depo. 69-71 (Johnson and Hunsinger made it to the landing, and gunshot was fired as they were descending); Hunsinger Depo. 40:19-21 ("I don't believe he made it to the top.  He might have been on the first or second [step] or maybe he was at the top landing."); *Id.* 28-29 (heard gunshot as he was being pushed

---

A: No.
Q: Did they always remain on the stairs that you could see?
A: Yes.
Q: Were they ever completely out of your view?
A: No.
Q: What happened next?
A: That's when I heard a shot.
. . .
Q: And where were you looking at the time you heard the gunshot?
A: Looking up the steps.
Q: How many gunshots did you hear?
A: One.
. . .
Q: Did you see who fired the gun?
A: No.
Q: Earlier you said that the Marshals Service were never out of your sight. Did you see any U.S. Marshall Agent fire their gun?
A: No.

Dwayne Depo. 94:24-97:6.  Dwayne gave a very similar account in an interview with the Camden County Prosecutor's Office on the day of the shooting.  *See* Bober Decl. Exhibit GG (Transcript of interview) at 6:133-134) (Q: They [the Marshals] didn't shoot, did they? A: No.).  Plaintiffs contend that a few statements or portions of statements from the January 8, 2008, interview with Dwayne show that what Dwayne saw is indeed in dispute.  For example, Plaintiffs point out that: (1) Dwayne Martin told McBride that after the gun shot "some [officers] came back down, cussing . . ." (Exhibit P-32, Dwayne Interview, at page 4); (2) when asked at what point he heard the gunshot, Dwayne answered: "When they just went in into his, when they said he was trying, someone, that's when he, they shot at him" (*id.* at 4); and (3) Dwayne said that the shot rang out before one of the officers said "he [Phillip] had a gun."  These comments, however, do not raise a genuine issue of fact for trial as the overwhelming majority of Dwayne's testimony at his deposition and his statements in the interview, including unequivocal statements made after Phillip gave the more confusing and ambiguous statements relied on here by Plaintiffs, support Defendants' contention that Dwayne Martin was able to see all of the Marshals as they climbed the stairs, including at the time a gunshot was heard, and that Dwayne did not see any Marshal discharge his weapon.

down stairs).[14]   There is no evidence that any Marshal fired his gun, and the only other person in the house, Linda, testified that she heard one gunshot but could not see from her vantage point who fired the gun. *See* Linda Depo. 155:7-10; *see also id.* 132:15-22.

As stated above, in support of their opposition to Defendants' motions for summary judgment, Plaintiffs submitted a declaration by Linda Martin, which states that Phillip Martin was shot by one of the Federal Defendants.  This declaration provides a different narrative than the one Linda Martin offered at her deposition and during an interview with Investigator McBride on the day of the incident.  "A party may not create a material issue of fact by filing an affidavit disputing his or her own testimony without demonstrating a plausible explanation for the conflict."  *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004). "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate."  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).  Here, it is clear to the Court that Linda Martin's declaration is offered solely for the purpose of defeating summary judgment by creating a triable issue of fact, and accordingly the Court will disregard the declaration in its entirety, which is appropriate because a district court may disregard this type of affidavit unless there is independent evidence to bolster the contradictory testimony.  *See id.* at 253-254.

Here, the declaration filed by Ms. Martin in an attempt to avoid summary judgment directly contradicts her deposition testimony on several crucial facts.  Most

---

[14] The Plaintiffs point to discrepancies or inconsistencies in the record regarding where the Marshals were when the shot went off and what the Marshals each saw, but the statements Plaintiffs rely on are not probative for a variety of reasons and certainly are not clear and direct enough to create a genuine issue of fact in view of the unequivocal deposition testimony given by each of the Marshals at their depositions.

importantly, Linda Martin testified at her deposition that after the Marshals entered her home she stood in the middle of the living room because the Marshals told her to, and that she could not see who fired the gunshot although she thought it was a Marshal. *See* Linda Depo. 132:21-22; *id.* 133:3-9. In the affidavit submitted in support of her motion for summary judgment, however, Ms. Martin again swore that it was one of the Marshals who shot Phillip Martin but this time she said she was "standing at the bottom of the stair [sic] and watched the US Marshals group," and that "after the agents were upstairs and out of my sight, I heard a gunshot; definitely from one of the officers." ¶¶ 4, 12-13. The crucial difference is that now Ms. Martin is saying that she was in a vantage point to see the Marshals ascend the stairs, reach the top, then go out of view. Previously, she had said she was standing in the middle of the living room and that she could not see the Marshals.

In addition, although more relevant to the topic of the Marshals entrance into the Martin home and the legal claims associated with that, Linda previously testified at her deposition that she had a conversation with the Marshals before they entered the home, and they entered after she told them that Phillip, the fugitive they were looking for, was in the house:

> Q: Did they ask you who was in the house with you?
> A: Yes, they did.
> Q: Who did you tell them was in the house with you?
> A: My son Dwayne and Phillip.
> Q: And what happened after that?
> A: They forced theirself in my house with their guns drawn and went upstairs and shot my son.

132:8-17.[15] This is consistent with her statement to the local police on that day:

> Q: Okay, so you answered the door, you saw them they had . . .

---

[15] *See also* Linda Dep. 131:7-132:10 (making clear that Linda had conversation with the Marshals as they were standing outside).

> A: They asked me who was here, I said me and my two sons.
> Q: Um Hum.
> A: And um, they came in and asked Dwayne his name and um they said what's the other son's name.  I said Phillip, he's upstairs.

*See* Jan. 8, 2008, interview of Linda Martin.  Now, recognizing that this admission is fatal to Plaintiffs' claims, *see infra*, Ms. Martin seems to have changed her story, claiming that the Marshals "simply barged their way in after I opened the door."  Plaintiffs do not provide a "plausible explanation for the conflict[s]," *Baer*, 392 F.3d at 624, so the Court will disregard the declaration.  *Jiminez*, 503 F.3d at 253.

Without Linda Martin's declaration, the plaintiffs have submitted no evidence that the Marshals shot Phillip Martin.  In their opposition to the Federal Defendants' motion for summary judgment, Plaintiffs offer no response to the point made that Dwayne testified that the Marshals never left his sight and never left the steps, yet all the evidence suggests, and even plaintiffs' expert opines, that the bullet that killed Phillip was fired from inside his bedroom, which was out of Dwayne's sight and clearly not where the Marshals were standing when the shot went off.

Although Linda and Dwayne Martin have testified that they believe Phillip did not kill himself, their belief as stated by them is based only on speculation, rather than facts or anything they observed.[16]  Summary judgment cannot be avoided by resorting to speculation, or statements of personal opinion or mere belief; indeed, "inference based on

---

[16] *See, e.g.*, Linda Depo. 170:5-12 (Q: I'm going to ask you for every reason that you believe it was not a suicide? A: Because he didn't have a gun. Q: Any other reason? A: Because he didn't have a gun. Q: How do you know he didn't have a gun? A: He wouldn't have brought a gun in my house."); *see also id.* at 135:15-24 (Q: And what happened after that? A: They forced theirself in my house with their guns drawn and went upstairs and shot my son. Q: Mrs. Martin, did you see anyone shoot your son? A: I was downstairs, I heard the shot. Q: Could you see who fired the shot? A: No.); *id.* 153:18-23 (Q: And where were the other two? A: I guess they was in the room shooting my son. Q: Could you see the other two after they got to the top of the stairs? A: No.); Dwayne Depo. 108:11-21 (Q: What did the police officer tell you about how he died? A: They said he committed suicide. Q: Did you believe them? A: No. Q: Why not? A: Because I knew he wouldn't do that. Q: I'm sorry? A: I know he wouldn't do that. Q: How do you know? A: I just know.).

speculation or conjecture does not create a material factual dispute." *Robertson*, 914 F.2d at 382 n.12; *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (party opposing summary judgment must rely on facts, not "opinions or conclusions"). There is no evidence apart from speculation that any Marshal fired his weapon, let alone that any Marshal made it to the top of the stairs, down the hallway, entered Phillip's room, shot him at close range from inside the room from a position consistent with the trajectory that the bullet traveled, and then had time to cover-up the scene. The Court simply does not see how that is possible, let alone plausible, based on the evidence in the record.

The physical evidence also supports the conclusion that Phillip shot himself. The bullet entered near Phillip's right temple and exited on the left side of his head; *see* Bober Decl. Exhibit O (Autopsy Report). Phillip was right-handed. *See* Linda Depo. 172:8-12. The medical examiner determined that the wound was a close-contact wound, meaning that the muzzle of the weapon was pressed against Phillip's head when the trigger was pulled. *See* Autopsy Report; Feigin Depo. 185-86. The bullet traveled on an upward trajectory through Phillip's brain. *See* Autopsy Report. These facts are consistent with a suicide and with Dwayne's testimony (as well as the testimony of the Marshals themselves) that the Marshals never left the steps, or, at most, were on the landing before turning around immediately. Dwayne's and the Marshals' testimony is inconsistent with the idea that one of the Marshals left the steps and shot Phillip Martin from close range, and with an upward trajectory. A single deformed .38 caliber bullet was found in the room, along with a .38 Smith & Wesson revolver, and the New Jersey State Police ballistics laboratory concluded that the spent casing that was recovered in the room had

been fired from the .38 Smith & Wesson that was recovered.  *See* Bober Decl. Ex. M (Lab Report).[17]

Plaintiffs' three expert reports do nothing to change the Court's conclusion that Plaintiffs have offered no plausible theory to support their version of the facts and to controvert the well-supported narrative offered by Defendants.  Plaintiffs' ballistics expert, Gary Rini, opines that "suicide can be excluded as the manner of death" because "the scene was altered," there was no blood found on the .38 Smith & Wesson or on Phillip's hands, and Phillip's right hand "was discovered tucked in a bag beneath him and between his legs."  *See* Bober Decl. Ex. CC (expert report of Gary Rini).  Thus, according to Rini, "there is no evidence documented or present that demonstrates that the decedent died as the result of a self-inflicted gunshot wound."  *Id.*  At the same time, Rini's rendering of the path that the bullet must have taken confirms that the bullet must have been fired from inside the bedroom.  *See* Bober Decl. Ex. DD (rendering prepared by Rini).  Rini does not explain who, if not Phillip, was the shooter, and how that shooter did so from inside the bedroom.  The notion that there was someone else in the bedroom at the time of the shooting is inconsistent with all of the deposition testimony before the Court, which agrees that none of the Marshals ever made it past the top of the step, or at the very farthest, the landing.[18]

---

[17] Although the .38 had been moved and unloaded before the scene was photographed, the two SWAT team members (who were the first people to enter the room after the shot was fired) testified that it would have been standard operating procedure to unload any loaded weapon they encountered, to protect against the possibility that the weapon could be used against them by persons unknown to them who were hiding. *See* Pleskonko Depo. 14:20-15:4; *id.* at 16:6-15; Ramos Depo. 13:5-16.  Discovery has not produced evidence sufficient to determine who "made the gun safe", but the fact that it was moved and unloaded is consistent with the evidence adduced in discovery.

[18] Rini also opines that Phillip was likely on his knees when he was shot.  It is difficult to ascertain, based on Rini's theory, how the shooter could have shot Phillip or from where, if the bullet traveled on an upward trajectory (as the evidence shows) and Phillip was on his knees when he was shot (as

The plaintiffs' other reports are from a psychiatrist who states that he performed a "psychological autopsy," and a pathologist who opines that the autopsy was flawed. The psychiatrist, Manuel St. Martin, concludes that Phillip might not have killed himself because he does not fit the profile of someone who would die by a self-inflicted gunshot wound during police confrontations; St. Martin says that such people are typically males either in domestic violence disputes, in hot pursuit by law enforcement, or in standoffs following the commission of a crime.  *See* Bober Decl. Ex. EE at 3.  But here, where a fugitive task force has surrounded the home of a suspect, entered the home, and is ascending the steps, guns drawn, in an attempt to arrest the suspect, it certainly can be said that police are in "hot pursuit" or a standoff situation.  In addition, and perhaps more importantly, St. Martin offers no opinion on whether Phillip killed himself, but rather states that "information about how Mr. Martin spent his final weeks and observations could shed light on the presence or absence of suicidal intent."  *Id.*

Finally, the plaintiffs submit the report of a pathologist, Dr. Emily Wofford Ward, who impugns the methods of Defendant Dr. Feigin.  Dr. Ward complains that Dr. Feigin's report is "quite short and confusing," and that the photograph of the wound "is of such poor quality and so out of focus that any interpretation of the wound appearance, based on the photographs, cannot be based on reasonable medical certainty and, therefore, would be more conjecture than sound opinion."  *See* Bober Decl. Ex. FF.  But it is Dr. Ward's opinion that is based on a photograph of poor quality, not Dr. Feigin's; Dr. Feigin actually conducted the autopsy.  Dr. Ward, on the other hand, does base her opinion on the photograph, and even though she believes the quality is so poor that "any

---

Rini surmises) – unless Rini believes that the shooter was lying on the floor or crouching incredibly low when he shot Phillip.

interpretation" would be "conjecture," she opines that Phillip's death "was not the result of a self-inflicted contact wound." *Id.* Given that she admits that the photograph is so poor that any opinion based upon it would be "conjecture," her opinion is of questionable admissibility. Finally, the fact that she opines so carefully that Phillip's wound was not a "contact wound", leaves open the possibility that Phillip fired the gun himself, as the Defendants contend he did.

These reports on their faces are insufficient to defeat summary judgment. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209 (1993). Thus, courts grant summary judgment when the expert relied upon by the party opposing the motion does not rely on sufficient facts to support his opinion. *See, e.g.*, *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198–99 (3d Cir. 1995) (affirming grant of summary judgment where plaintiff's expert "lack[ed] a factual basis"; "expert testimony without . . . a factual foundation cannot defeat a motion for summary judgment"). Because the Plaintiffs' expert reports are conjecture and further because they are contradicted by the record, they are insufficient to defeat summary judgment.

Against the substantial evidence presented by Defendants that Phillip Martin's death was a suicide, and without the declaration of Linda Martin and the expert reports, Plaintiffs can only point to various alleged inconsistencies or deficiencies in the ensuing investigation and in testimony generated during this litigation, which they contend are evidence that the Marshals killed Phillip Martin and that the Marshals and the rest of the

Defendants conspired to cover up the killing.   However, Plaintiffs have submitted absolutely no credible evidence that Phillip Martin's death was anything but a suicide. Defendants' various theories of inconsistencies and deficiencies in the investigation are too numerous to recount all of them here, but the Court will address a few of the allegations.

Citing *Webster v. City of Houston*, 689 F.2d 1220 (5th Cir. 1984), Plaintiffs argue that there is sufficient evidence from which a jury could conclude that the Federal Defendants employed the "throw-down" technique, *i.e.*, that the Federal Defendants killed an unarmed Phillip and then "threw down" a gun next to him to make it look as if the he had been armed.  *See* Opp. Br. 17-21.  But *Webster* is readily distinguishable. Unlike the instant case, the plaintiffs in *Webster* had very strong evidence to support their claims apart from speculation: first, a taxi driver and a local resident who had witnessed the shooting testified that Webster had no weapon and was shot without putting up any resistance.  *Id.*  Further, one of the arresting officers testified against his fellow officers and admitted under oath that Webster had been shot while he was pinned to the ground and, in the officer's opinion, his fellow officers had used excessive force.  *Id.* at 1222. Plaintiffs here do not have anything that approaches the evidence in *Webster*.

Plaintiffs' arguments are based largely on the fact that defendant Tim O'Brien testified in his deposition that he had inherited a Smith & Wesson when his father-in-law passed away in 1992, which was the same type of gun that was recovered near Phillip's body.  *See* Opp. Br. at 20-21.  There is no evidence tying the gun recovered at the scene to the gun O'Brien inherited from his father-in-law.  Further, O'Brien later corrected his testimony, explaining that he was mistaken and the gun in question was actually a Colt.

*See generally* O'Brien Decl.  Plaintiffs argue, as Defendants did with regard to Linda Martin's declaration, that the "sham affidavit" doctrine applies and that the Court should disregard O'Brien's corrective declaration.   *See* Opp. Br. at 20-21.  However, unlike Linda Martin, O'Brien has provided a plausible explanation for the conflict between his declaration and his testimony.  Further, the point on which his declaration differs from his testimony – whether the gun he inherited from his father-in-law was a Smith & Wesson or a Colt – is not material in the full context of his previous statements, and in the context of the facts as a whole.[19]   The Court therefore credits his declaration, which appears to be the most accurate and full account of his gun ownership.  It was therefore not possible that O'Brien's gun was used to kill Phillip because, among other reasons, there is no evidence that O'Brien owned a Smith & Wesson, or that he inherited the alleged Smith & Wesson before the events that gave rise to this case.  Even if Plaintiffs had shown that O'Brien owned a Smith & Wesson before January 8, 2008, he would be one of many Smith & Wesson owners, and the fact remains that even if O'Brien did own one the plaintiffs still have presented no evidence tying the gun that was found in the room to

---

[19] O'Brien collects guns.  One of the plaintiffs' interrogatories asked him to "identify the manufacturer and model of each and every firearm" that he "was issued, acquired, or purchased at any time from January 1, 2005, through January 8, 2008." *See* O'Brien Interrogatories at 13.

At his deposition, O'Brien was asked whether he had *ever* owned a Smith & Wesson, and he testified that he had, and that he (or, rather, his wife) had inherited one from his wife's father, when he passed away.  *See generally* O'Brien Depo. 26-33. O'Brien explained that he had not included that gun on the list of 20 guns in his interrogatory responses because he did not acquire it between January 1, 2005, and January 8, 2008, which was the time frame given in the interrogatory. *See* O'Brien Depo. 34:1-8.

Thereafter, in September 2012, O'Brien provided plaintiffs with a declaration explaining that after the deposition he had examined the gun he inherited (which had been locked away in a safe for years) and discovered it is a Colt, not a Smith & Wesson; further, he had discussed the issue with his wife and sister-in-law and determined that he must have acquired the gun in spring 2008 (after the incident at the Martin home) because that was when his family cleaned out his in-laws' house and discovered the gun, while preparing for an estate sale.  *See* O'Brien Decl. ¶¶ 14-15.  O'Brien, unlike Linda Martin, provided a "plausible explanation" for the discrepancy between his testimony and his declaration.  Further, O'Brien, unlike Linda Martin, is not trying to avoid summary judgment by changing his testimony on a material fact.

O'Brien, or any evidence that the Defendant were carrying any weapons that day other than their duty weapon, which the record shows were never fired.

As stated above, Plaintiffs offer numerous other theories and reasons why they say it is possible that Phillip Martin was killed by one of the Marshals. But based on the evidence before the Court, there is no plausible theory of the facts supporting Plaintiffs' contention. In order for Plaintiffs to prevail on the unjustified shooting and cover-up theory they put forth, the jury would have to find, by a preponderance of the evidence, as follows: one of the Marshals, intending to kill Phillip, arrived at 103 S. 35th Street armed not only with his duty weapon but with an extra gun – the .38 Smith & Wesson – that he had acquired illegally because it was not registered to any of the Marshals. He then used the Smith & Wesson to execute Phillip at close range, from inside Phillip's bedroom, even though, according to Dwayne's testimony, the Marshals never left the steps, were never out of his sight, and never fired their guns. Even if a factfinder believed that there is sufficient evidence to find that one of the Marshals did leave the steps, it would also have to believe that the Marshal accomplished the physical mechanics of the murder and the planting of the "throw down" all within a matter of seconds.[20]

The Plaintiffs' version of the facts also depends on a jury believing that the Marshals who did not commit the murder then decided to risk their careers, livelihood, and freedom by assisting in a cover-up, which involved planting the Smith & Wesson,

---

[20] As the Federal Defendants point out, taking into account Plaintiffs' own expert report, which opines that the wound on Phillip's head is more consistent with a .40 caliber or larger bullet than a .38, Plaintiffs' burden of showing that claims are plausible actually increased. This is because if the Plaintiffs are to be believed, then the Marshals would have had to come armed with not one but two extra guns, one being the real murder weapon, and the other being the .38 that they used as a decoy (along with a deformed bullet and spent shell casing, to make it look as if the .38 had been fired). They then killed Phillip with the murder weapon, recovered the bullet from that gun after it bounced around the room, and left the Smith & Wesson, deformed bullet, spent casing, and unfired rounds behind as a decoy. The Defendants would have also had to have done this all in a matter of seconds and without leaving the stairs.

and convincing a number of other people from the SWAT team, the local Camden police, the County Prosecutor's Office, and the medical examiner to also risk their careers and freedom to help them conceal the murder.  Finally, a factfinder would also probably have to believe that whoever came ready with a throwdown gun and shot Phillip Martin did this because they intended to murder a fugitive they had never met before and had no reason to want dead.  The competing version of the facts, and the only plausible one in the Court's judgment, is that "Phillip, a felon with a string of convictions who had spent much of his adult life in prison, shot himself as the police approached."  Fed. Def. Br. at 31 (Docket No. 120-4).

As the Supreme Court has explained, only *genuine* disputes of material fact preclude summary judgment, and the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.  Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The evidence here only supports one version of facts.  Accordingly, summary judgment is granted in favor of Defendants on Count 1 to the extent it is based on the unjustified shooting theory.

> **B.      Excessive Force Without Shooting**

Having decided that the Federal Defendants are entitled to summary judgment on Count One to the extent that it is based on allegations of an unjustified shooting by the Marshals, the Court now considers whether Plaintiffs have stated a claim in Count One

under an alternate theory.   In their opposition to the Federal Defendants' motion for summary judgment, Plaintiffs also argue that an excessive force claim lies against the Federal Defendants separate and apart from the claim that the Marshals shot Phillip Martin.   In support, Plaintiffs argue that the Marshals were too aggressive and should have employed alternative tactics before ascending the stairs.   Plaintiffs argue that Defendants never gave Phillip Martin any opportunity to voluntarily submit himself for an arrest, and Phillip never resisted any commands to submit to an arrest.   Plaintiffs argue, that Phillip should have been given an "opportunity to voluntarily submit himself for an arrest," Opp. Br. at 14, because, according to plaintiffs, parole violators "would ordinarily be allowed to surrender." *Id.* at 16-17.   Plaintiffs cite nothing for their claim that Phillip "ordinarily" would have been allowed to surrender, and indeed Defendants' deposition testimony showed otherwise.   *See* Cunane Dep. 86:5-17 (explaining that Marshals ordinarily, for officer safety purposes, would not announce themselves when attempting to locate and arrest a fugitive with weapons charges).

However, the standard in this inquiry is not what Marshals or law enforcement officials "ordinarily" do, but instead it allows that law enforcement officials must make split-second determinations in situations such as the one confronted by the Marshals when they arrived to execute an arrest warrant that morning.   "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso,* 183 F.3d 279, 288 (3d Cir.1999).   In conducting the inquiry as to the reasonableness of the "seizure", "a high degree of discretion is clearly involved in deciding when and how to make an arrest." *Griggs v. Wash. Metro. Area Trans. Auth.*, 232 F.3d 917, 920 (D.C. Cir.

2000); *see also Sharrar v. Felsing*, 128 F.3d 810, 821 (3d Cir. 1997) ("the calculus of reasonableness [for use of force] must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving"), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007).

Here, the Federal Defendants' decision to ascend the stairs rather than call upon Phillip to surrender does not provide a basis for an excessive-force claim. As discussed in *Sharrar*, officers approaching a fugitive felon with a long string of convictions, outstanding weapons charges, and multiple arrest warrants must be afforded wide latitude in determining how best to effectuate the arrest. Given the tense and uncertain circumstances inherent in approaching such an individual in an unfamiliar house, under *Sharrar* there can be no excessive force claim even if the officers departed from "ordinary procedures" in drawing their guns.

Plaintiffs also argue that the Federal Defendants can be liable because when they saw Phillip with a gun they had a "legal duty to rescue [him] from eminent [sic] danger." Opp. Br. at 3. But there is no constitutional right to police protection. *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). As the Supreme Court has explained, although the Constitution "forbids the State itself to deprive individuals of life, liberty, or property without due process of law, . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." 489 U.S. at 195; *see also Segreti v. Borough of Wilkinsburg*, No. 09-1511, 2011 WL 284130, at *6 (W.D. Pa. Jan. 26, 2011) ("the Supreme Court has . . . held that individuals do not have a constitutional right to police protection) (citing

*DeShaney*).  Thus, even if the Marshals had a duty to protect Phillip from himself when they encountered him with a gun, any breach of that duty would, at most, be a negligence claim, not a *Bivens* claim.  *See, e.g.*, *Lach v. Robb*, 679 F. Supp. 508 (W.D. Pa. 1988) ("There is no constitutional right to police protection" and "the fact that Pennsylvania law imposes a duty on a police officer to make a reasonable effort to rescue a person in danger cannot create a constitutional right") (citations omitted).

Accordingly, based on the undisputed facts at this stage, Defendants are also granted judgment as a matter of law on the theory that Defendants used excessive force in drawing their guns and in failing to rescue Phillip Martin when they saw him holding a gun.

### C.    Unlawful Search

The Court has already addressed Count One to the extent it states a claim for the shooting of Phillip Martin, and to the extent it states an excessive force claim based on the Marshals having drawn their guns.  But it is unclear exactly how the plaintiffs allege that the Marshals violated the Fourth Amendment because the Second Amended Complaint is bereft of description apart from alleging that the Marshals "are liable for violating [the plaintiffs'] Fourth Amendment rights as evidenced by the facts alleged herein."  ¶ 118.   The summary judgment briefing and oral argument revealed that Plaintiffs are also alleging that their Fourth Amendment rights were violated when the Federal Defendants entered their home to execute the arrest warrant.

Plaintiffs are in error.  Law enforcement officers do not require a search warrant to enter a suspect's home when they have an arrest warrant for the suspect.  *See Payton v. New York*, 445 U.S. 573 (1980).  "An arrest warrant founded on probable cause implicitly

carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.*  As the Third Circuit has explained, "*Payton* requires that officers have a reasonable belief that the arrestee (1) lived in the residence, and (2) is within the residence at the time of entry." *United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006); *see also United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005) ("[*Payton*] establishes that police may enter a suspect's residence to make an arrest armed only with an arrest warrant if they have probable cause to believe that the suspect is in the home.").[21]

Applying these standards, the Marshals are entitled to summary judgment on the claim that they violated the Fourth Amendment by entering Plaintiffs' home, because the Marshals had an arrest warrant and a reasonable belief that Phillip Martin was residing and present at 103 S. 35th Street.  Multiple arrest warrants had been issued for Phillip. *See* Bober Decl. Ex. A.  The home the Marshals entered – 103 S. 35th St. – was Phillip's home, and Plaintiffs allege as much in the Complaint.  *See* ¶ 6 (alleging that Phillip "lived in his mother's family home at 103 S. 35th Street, Camden, NJ").  The Plaintiffs also admitted as much at their depositions.  *See* Linda Depo. 79:5-7 ("Q: Did Phillip move back into the house at the same time you did? A: Yes."); *see also* Dwayne Depo. 56-57.  Apart from the fact that Martin was in fact residing at 103 S. 35th Street, it was reasonable for the Marshals to believe that he was residing there, because at the time they

---

[21] As the Circuit noted in *Veal*, it is somewhat uncertain whether courts should apply a "probable cause" or "reasonable belief" standard to the question of whether a suspect is in the residence, nor is it clear whether there is a difference between the two.  *See Veal*, 453 F.3d at 167 n.3 (noting that "the two terms may be synonymous" but reasonable-belief standard was "possibly lower").  More recently, the Circuit has applied the reasonable belief standard.  *See United States v. Correa*, 653 F.3d 187, 192 n.5 (3d Cir. 2011) ("*Payton* requires that officers have a reasonable belief.").  Most courts have held that the reasonable belief standard is lower.  *See, e.g., Bartlett v. City of New York*, No. CV 031961(CPS), 2005 WL 887112, at *5 (E.D.N.Y. Feb. 11, 2005) ("'Reasonable belief' standard is less stringent than a probable cause standard.").  Regardless, the Court need not resolve the issue, as summary judgment is appropriate under either standard.

approached the residence (1) they were in possession of a warrant that listed that address as his home, *see* Bober Decl. Ex. A, and (2) they had information from a confidential source indicating that Phillip had recently used Dwayne's cell phone, and that Dwayne lived at 103 S. 35th St., *see* Bober Decl. Ex. C (USMS ROI dated Dec. 13, 2007).

Plaintiffs argue that Defendants have failed to show that they had "reasonable belief" that Phillip Martin was in the home. *See United States v. Veal*, 453 F.3d 164, 167 (3d Cir. 2006). Plaintiffs say that Defendants have offered no credible evidence to establish that Phillip lived at the house; Plaintiffs discount the value of the warrants that listed his mother's home as a previous address, because the warrants were either old or contradicted by other warrants showing different addresses. Plaintiffs argue that the fact that Defendants went to Ms. Boyce's home before Linda Martin's home on the morning of Phillip's death shows that the Marshals were still searching for Phillip Martin, and that they had no idea where he lived or that he was inside Ms. Martin's residence at the time they entered her home. Plaintiffs also argue that because Linda Martin's home was vacant until the evening of January 7, 2008, the night before the shooting, as a result of a fire that damaged the building a year before, the Marshals could not have had a reasonable belief that Phillip Martin resided in the home. Plaintiffs also fault the Marshals for not having conducted prior surveillance of the home. Finally, Plaintiffs argue that, at most, the Defendants learned from their conversation with Ms. Martin that Phillip was *inside the home*, not that he "lived in the residence", which is the requirement under *Payton*.

Despite what Defendants argue, what matters here is what the Marshals knew at the moment they entered the home. *See United States v. Torres*, 534 F.3d 207, 210 (3d

Cir. 2008) (explaining that after "pinpoint[ing] the time of the Fourth Amendment seizure," court must ask whether seizure was "justified by reasonable, articulable facts known to the officer *as of that time.*") (emphasis added); *United States v. Brown*, No. 12-23, 2013 WL 124280, at *4 (D. Del. Jan. 8, 2013) ("probable cause is measured from the perspective of an objective law enforcement officer in light of the totality of the circumstances known to that officer at the time").   To the extent there was any doubt about where Phillip was residing, Linda resolved it at the door when she said that her children Dwayne and Phillip were in the home with her, *before* the Marshals entered her home.  *See* Linda Depo. 132:8-15.[22]  Dwayne also testified that Linda Martin gave the Marshalls her two children's first names when asked.   Dwayne Depo. 85:9-24. Therefore, under *Payton* and its progeny, the Marshals are entitled to summary judgment on the claim that they violated the Fourth Amendment by entering Plaintiffs' home.

Because the Court finds that Philip was residing at 103 S. 35th st., it is not necessary to decide if the Marshals are entitled to qualified immunity, but nevertheless notes that qualified immunity would be appropriate in this case.   Qualified immunity protects reasonable mistakes.  *See Anderson*, 483 U.S. at 641 (explaining that qualified immunity protects government officials from personal liability for reasonable mistakes). Given the information that the officers had at the time they knocked on the door and had already eliminated Boyce's apartment as a potential residence, coupled with the statement from Linda Martin confirming that Phillip was in the house at 6:30 a.m., it was

---

[22] Q: Did [the Marshals] ask you who was in the house with you?
   A: Yes, they did.
   Q: Who did you tell them was in the house with you?
   A: My son Dwayne and Phillip.
   Q: And what happened <u>after that</u>?
   A: They forced theirself in my house . . . .
*Id.* (emphasis added).

reasonable for the Marshals to enter the house because they had an arrest warrant plus a reasonable belief that Phillip was living there and present at the time.

### D. Detention of Linda and Dwayne Martin (as to Federal Defendants)

In addition, to the extent the Fourth Amendment claim against the Federal Defendants suggests Plaintiffs' rights were violated when they were detained by the US Marshals after a gunshot was fired, the claim fails as well (although Linda and Dwayne's detention will be revisited *infra* in the next section as it concerns the non-Federal Defendants). Though the Fourth Amendment establishes the right to be free from warrantless seizures, "there are exceptions to the warrant requirement." *Illinois v. MacArthur*, 531 U.S. 326, 330 (2001). Thus, "when faced with special law enforcement needs, . . . the [Supreme] Court has found that certain . . . circumstances may render a warrantless search or seizure reasonable." *Id.* As relevant here, it is reasonable for law enforcement officers to detain individuals who are on premises being searched, so officers can protect themselves during the search, suspects do not flee, and evidence is not destroyed or hidden. *See Michigan v. Summers*, 452 U.S. 692, 702-03, 705 (1981). Thus, once Linda Martin told the Marshals that Phillip Martin – the subject of an arrest warrant – was in the house, it was reasonable for the Federal Defendants to briefly detain the occupants so they could search for Phillip, ascertain which of the people they encountered was Phillip, and prevent other occupants of the home from alerting Phillip as to the Marshals' approach, thereby ensuring officer safety.

Moreover, once a gunshot had been fired, a brief seizure of the occupants was justified because, at that point, both probable cause and exigent circumstances existed. *See, e.g.*, *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (warrantless seizure is

presumptively unreasonable "unless probable cause and exigent circumstances exist to justify the intrusion").  Here, probable cause existed because the Marshals had just been informed that Phillip, the subject of multiple arrest warrants, was in the house; moreover, they had seen him in possession of a handgun, and they knew that Phillip was a felon wanted for, among other things, possession of a gun.  Exigent circumstances existed because a shot has just been fired by a suspect that was being pursued by law enforcement.  *See, e.g.*, *Coles*, 437 F.3d at 365 ("Examples of exigent circumstances include . . . hot pursuit of a suspected felon . . . and danger to the lives of officers or others."); *see also Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").  It was thus reasonable for the Marshals to briefly detain the occupants until the situation was resolved.[23]

Accordingly, for the reasons stated above, the Federal Defendants are entitled to summary judgment on any and all claims premised on a violation of the Fourth Amendment.[24]

---

[23] To the extent that Plaintiffs are pursuing a claim of false imprisonment because after Phillip shot himself they were transported to a local police station and questioned, this claim does not bear on the Marshals.  At the point that the two were transported from the scene and questioned, the Martins were not in the Marshals' custody.  *See* Linda Depo. 173:10-11 (Linda was transported to the police station by Camden City police officers); Dwayne Depo. 112:17-24 (explaining that Marshals asked him to leave the house and he left, and that later he was handcuffed and taken in a Camden City Police Car to the Camden City Police Station); Cunane Depo. 73:4-7 (stating that "Dwayne was handed off to a Camden City Police Officer" shortly after the gunshot).

[24] Also, it should be noted that although the Court discusses the claims against the Federal Defendants collectively, because there is no evidence that either Fallon or Scott entered the house before the gunshot was fired they are certainly entitled to summary judgment on any claim against them premised on excessive force or warrantless entry, and to the extent that the plaintiffs seek to hold Fallon and Scott accountable for entering the house after the gunshot, the claim must fail because at that point exigent circumstances existed that justified a warrantless entry.

**IV.**     **Counts Six and Seven as to the Federal Defendants**

Counts Six and Seven allege that the Marshals are liable for violations of state law. *See* ¶ 140 ("excessive use of force in violation of Article I, section 7 of the New Jersey Constitution."); *id.* ¶¶ 143-47 (common law wrongful death). It is clear that the Marshals, although they each worked for state and local law enforcement agencies, are to be considered federal agents acting under federal law during the incident in question. Federal law provides that a state or local police officer who is "assigned to a federal agency" is "deemed an employee of the agency for the purpose of . . . the Federal Tort Claims Act and any other Federal tort liability statute." 5 U.S.C. § 3374(c)(2); *see also, e.g.*, *Aikman v. County of Westchester*, 691 F. Supp. 2d 496, 498 (S.D.N.Y. 2010) ("state and local law enforcement officers designated as federal task force members are treated as federal employees for the purposes of any federal tort liability statute"); *Cook v. Drew*, No. 06-38, 2007 WL 3072238, at *6 (W.D. Pa. Oct. 19, 2007) ("State police officers deputized as federal agents . . .  constitute federal agents acting under federal law.")

The claims in Counts Six and Seven therefore must be dismissed against the Federal Defendants because a *Bivens* action may only be lodged against federal officials "for violations of federal constitutional rights." *Andrews v. United States*, No. 12-2516, 2012 WL 5249977, at *1 (D.N.J. Oct. 24, 2012); *see also Warren v. United States*, 279 Fed. Appx. 162, 163 (3d Cir. 2008) ("*Bivens* created a cause of action for damages . . . for violating an individual's federal constitutional rights."). Courts thus dismiss state constitutional claims against federal officers. *See, e.g.*, *Hartman v. Hanson*, No. 09- 18 03227, 2010 WL 335677, at *6 (N.D. Cal. Jan. 22, 2010). Likewise, state law claims such as Plaintiffs' common-law wrongful death claim cannot be brought against federal

officers; rather, they must be brought pursuant to the Federal Tort Claims Act ("FTCA") and satisfy its exhaustion requirements.  *See* 28 U.S.C. § 2679(b).  As the plaintiffs have not pursued their remedies under the FTCA, their state-law claims must be dismissed.

The FTCA waives the sovereign immunity of the United States and permits suits for damages for certain acts or omissions by government employees.  Under 28 USCA §2680(h) liability of the United States extends to claims of negligence and the intentional torts of assault, battery, false imprisonment, etc., when these are committed by federal investigative or law enforcement employees.  *See*, *Gasho v. United States*, 39 F.3d 1420 (9th Cir. 1994); *Price v. United States*, 728 F.2d 385 (6th Cir. 1984); and *Sheridan v. United States*, 487 U.S. 392 (1988).  Plaintiffs argue that the FTCA is not applicable because the Federal Defendants did not engage in the allegedly wrongful conduct within the scope of their employment, which is required for the Act to apply.  Plaintiff argues that it has been held that customs agents who shot a courier were acting outside the scope of their employment, and therefore not protected under the FTCA.  See *Attallah v. United States*, 955 F.2d 776 (1st Cir. 1992).  However, this argument is unavailing here where the Court has already held that the undisputed evidence shows that the Marshals did not shoot Phillip Martin; here, the evidence shows that the actions of the Marshals were undertaken in the scope of their employment.

Plaintiffs also argue, contrary to Defendants' arguments, that they did satisfy the notice requirements of the FTCA.  As a jurisdictional prerequisite to filing certain types of civil suits against federal agents the FTCA requires a claimant to place the government on notice, within ninety days of the accrual of such claim.  28 USCA §1346(b), et seq.  Plaintiffs argue that all of the criteria of the requirements for notice set forth in the FTCA

48

were met by the letter Ms. Martin allegedly sent to a number of officials on March 23, 2008, including Chris Christie, who at the time was the United States Attorney for the District of New Jersey.  *See* Opp. Br. at 36-37.  This letter, assuming it was sent to Christie, does not satisfy the FTCA exhaustion requirements.  The FTCA provides that, to exhaust a claim, a claimant "shall," before filing a lawsuit, "present[] the claim to the appropriate Federal agency."  *See* 28 U.S.C. § 2675(a).  The purpose of this requirement is to ensure that the relevant agency has notice of the claim, so that "it may investigate the claim and respond either by settlement or by defense."  *Tucker v. U.S.P.S.*, 676 F.2d 954, 958 (3d Cir. 1982).  The Attorney General has promulgated regulations that govern the presentation of administrative claims under 28 U.S.C. § 2675(a); among them is 28 C.F.R. § 14.2, which provides:

> For the purposes of the provisions of 28 U.S.C. 2401(b), 2672, and 2675, a claim shall be deemed to have been presented when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an accident, *accompanied by a claim for money damages in a sum certain* for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident . . . .

28 C.F.R. § 14.2(a) (emphasis added).  The FTCA must be "strictly construed."  *Livera v. First Nat'l Bank of N.J.*, 879 F.2d 1186, 1194 (3d Cir. 1989).

Ms. Martin's letter does not satisfy the FTCA exhaustion requirements for many reasons, most evidently because it does not, as required, contain a "claim for money damages in a sum certain."  28 C.F.R. § 14.2(a).  Courts routinely dismiss complaints for lack of subject matter jurisdiction when the administrative claim did not contain a "sum certain."  *See, e.g.*, *Hoffenberg v. United States*, No. 10-2788, 2012 WL 379934, at *4 (D.N.J. Feb. 6, 2012); *Castro v. United States*, No. 10-5199, 2010 WL 4810629, at *4

49

(D.N.J. Nov. 15, 2010).  Letters sent to Government officials that do not contain a "sum certain" do not satisfy FTCA exhaustion requirements.  The Court therefore lacks subject matter jurisdiction over plaintiffs' unexhausted FTCA claims.[25]

**V.    Counts Two and Three: 42 U.S.C. § 1983 Claims Against Non-Federal Defendants**

Count Three alleges that "law enforcement officers of Camden County and the CCPD" are liable to plaintiffs under 42 U.S.C. § 1983 and the 4th Amendment to the U.S. Constitution for their "unlawful acts".  Count Two, subtitled "14th Amendment Equal Protection Violation," alleges that the "above listed law enforcement officers from Camden County, and [the Camden City Police Department]" are liable under 42 U.S.C. § 1983 for violating Plaintiffs' 14th Amendment equal protections and/or due process rights, and that Defendant Dr. Feigin is liable to the decedent's estate for violating his 14th amendment equal protection rights by discriminating against Phillip Martin on the basis of his race, as evidenced by the "deficient autopsy report and manner of death conclusion."  Both Counts allege liability on the part of state actors under 42 U.S.C. for violations of the United States Constitution.  Both Counts are somewhat understandable from a plain reading, but both suffer from vagueness.  In addition, Plaintiffs' briefs in opposition to the various motions for summary judgment assert what appear to be novel interpretations of the claims in Count Two based on factual theories which arguably were not plead in the Complaint.

---

[25] In addition, the letter did not even provide notice to the federal government that the Martins intended to seek money damages; rather, it merely complains about the conduct of various law enforcement officers and asks for information about what occurred.  Given the purpose of the FTCA's notice requirement (*i.e.*, to put the Government on notice of a forthcoming lawsuit) the letter does not qualify as an administrative claim for purposes of the FTCA.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege that the conduct complained of has been committed by a person acting under color of state law and that the conduct complained of deprived the plaintiff of a right or privilege secured by the United States Constitution. *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995). The parties do not dispute that Defendants were acting under color of law. Thus the operative question is whether the Plaintiffs have stated a claim for the violation of their constitutional rights.

Analysis of a § 1983 claim begins by identifying the "exact contours of the underlying right said to have been violated" and then determining "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir.2000); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998). Plaintiffs allege that they were deprived of a number of Constitutional rights or privileges due to the conduct of the individual Camden County and Camden City Defendants acting under color of state law, including: Plaintiffs' 4th Amendment rights to be free from unreasonable searches and seizures, their 14th Amendment right to equal protection under the laws, their right to a relationship with their family member, and their right to meaningful access to the courts. Plaintiffs also allege that these Defendants are liable under § 1983 for participating in a conspiracy to deprive Plaintiffs' constitutional rights. Finally, Plaintiffs assert that the municipalities of Camden City and Camden County are liable under § 1983 for their deliberate indifference to the Constitutional rights of their citizens.

## A.  Count Three: 4th Amendment

Count Three states a claim under § 1983 for the violation of Plaintiffs' 4th

Amendment rights by "law enforcement officers of Camden County and the [Camden County Police Department]."  The Court interprets this claim as being alleged against the Camden City Defendants, who were all working for the Camden City Police Department on January 8, 2008, and against McBride, the investigator from the Camden County Prosecutor's Office.  The Court reads Count Three as alleging violations of Plaintiffs Linda and Dwayne Martin's 4th Amendment rights by way of Defendants' search of the Martin home, and by way of Defendants' seizure and detention of Linda and Dwayne after the gunshot.

### 1.   Search of Martin Home

The Fourth Amendment, incorporated to the states by way of the Fourteenth Amendment, protects an individual against an unlawful search or seizure by providing that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.; *Miller v. Hassinger*, 173 F. App'x 948, 952 (3d Cir. 2006).  "Physical entry into the home is the chief evil against which the . . . Fourth Amendment is directed."  *United States v. United States District Court*, 407 U.S. 297, 313, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1972).  "At the very core [of the Fourth Amendment and the personal rights it secures] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Silverman v. United States*, 365 U.S. 505, 511, 5 L. Ed. 2d 734, 81 S. Ct. 679 (1961); *see also Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.").

Two exceptions to the warrant requirement relevant here are when the state actors have been given consent and when there are exigent circumstances.  The consent required must be freely given. It is ineffective if extracted by the state under threat of force or under claim of government authority. In *Schneckloth v. Bustamonte*, the Supreme Court summarized the law as follows:

> If under all the circumstances it has appeared that the consent was not given voluntarily – that it was coerced by threats or force, or granted only in submission to a claim of lawful authority – then we have found the consent invalid and the search unreasonable.

412 U.S. 218, 233, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

"Exigent circumstances" encompasses a number of related exceptions to the normal requirement of a search warrant as a predicate to a search of a home:

> The Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.  Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."

*Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (quoting *Wayne v. United States*, 115 U. S. App. D. C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.)) (internal citations omitted).  "Warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment."  *Id.*

Here, Camden City Defendants move for summary judgment on the claim that they violated Plaintiffs' Fourth Amendment rights by unlawfully searching their home, and they are entitled to judgment in their favor because although Linda Martin has

disputed that her consent was freely given, the exigencies of the situation required that they search the home. The Camden City Defendants who entered the home all did so after the "shots fired" radio call went out. The SWAT team had been activated to deal with an active shooter situation. Although the Camden City Defendants appear to have sought Ms. Martin's consent, the exigencies of the situation did not require that they did. "The need to protect or preserve life or avoid serious injury" was clearly present here, thus the Camden City Defendants are entitled to summary judgment.

Even if the Camden City Defendants did not have consent and the exigencies of the situation did not require that they enter the Martin home, they also may be entitled to qualified immunity for their actions. Any of the officers who had a reasonable belief that Ms. Martin's consent was freely given would be entitled to qualified immunity, as would any officer who had a reasonable belief that the exigencies of the situation required their presence in the home.

### 2.      Detention of Linda and Dwayne

The Fourth Amendment requires that the state has both probable cause and a warrant, or some established exception to these requirements, before a seizure can occur. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968); *see also, e.g., Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989). A less intrusive *Terry* stop and frisk may be performed based only on reasonable suspicion, which itself constitutes one such warrant exception. *Id.* But even with a warrant, or in the case of a *Terry* stop on reasonable suspicion, the probable cause or reasonable suspicion "of guilt must be particularized with respect to the person to be searched or seized." *See also Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (arrest with warrant); *Ornelas v. United States*, 517 U.S. 690, 696 (1996)

(requiring "a particularized and objective basis for suspecting the person stopped of criminal activity").  As noted *supra*, the Court has also "identified several [types of] exigencies" that justify searches and seizures without a warrant.  *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).  In addition, the Supreme Court has recognized an exception to the traditional warrant requirement for administrative searches – regulatory inspections that have a "primary purpose" distinct from "the general interest in crime control," *City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000), *i.e.*, searches that serve "'special needs, beyond the normal need for law enforcement.'"  *Bd. Of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985).  Finally, the Court notes that officers may, of course, approach witnesses to question them, *see, e.g.*, *United States v. Drayton*, 536 U.S. 194, 200 (2002), but they must stop short of "seizing" a witness – taking steps that would lead a reasonable person in her position to feel she was not "free to leave," or,  "free to decline the officers' requests or otherwise terminate the encounter" – absent reasonable suspicion that the witness herself may be involved in a crime.  *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991) (internal quotation marks omitted).

A claim for false imprisonment arises where a person is arrested without probable cause, or without some exception to the warrant requirement, and subsequently detained pursuant to that unlawful arrest. *Adams v. Selhorst*, 449 F. App'x 198, 201 (3d Cir. 2011) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)).  The Court has already noted *supra* that the exigencies of the situation justified the Federal Defendants' brief "seizure" of Dwayne and Linda – which was essentially removal from the home in Linda's case, and a command to stay in place and then a request to leave the

55

home in Dwayne's case.  But the facts are less clear with regard to their detention by Camden City Police after their removal from the home – what from the facts before the Court seems to have amounted to false arrest and imprisonment.  Plaintiffs assert that they were forcibly put in a locked police vehicle against their will, then transported to a police station without being allowed to get appropriate clothing or personal items.  Dwayne Martin was handcuffed.  Linda Martin asked to leave several times.  Plaintiffs were offered no justification for their arrest and continued detainment.

Nor do the Camden City Defendants offer any justification for Linda and Dwayne's arrest for the purposes of their motion for summary judgment.  Instead, they assert that no Camden City Defendant was involved in the arrest and in Plaintiffs' transportation to the police station.  *See* Camden City Opp. at 9.  This is plainly disputed by the Plaintiffs, who assert that at least officers Wiley and Matthews were present during and actively involved in portions of their detention.  Plaintiffs also assert that one Camden City Defendant, albeit unknown to them which Camden City Defendant, transported them to the police station.  Under the circumstances, the Court cannot grant summary judgment to the remaining Camden City Defendants on the claim that they violated Plaintiffs Linda and Dwayne's Fourth Amendment rights to be free from unreasonable seizures.

In addition, under the circumstances the Court cannot grant summary judgment to McBride of the Camden County Prosecutor's Office.  Although Investigator McBride's interviews of Linda and Dwayne were brief, the Plaintiffs were unquestionably being detained at the time of the interviews.  Based on the undisputed facts before the Court, it cannot be said that McBride is entitled to judgment as a matter of law on this claim.

Accordingly, his motion for summary judgment on Count Three is also denied with respect to Linda and Dwayne Martin's 4th Amendment claim.

**B.      Count Two: Other § 1983 Claims**

Count Two asserts additional § 1983 claims, all of which are dismissed for the reasons that follow.  Defendants initially interpreted Count Two as stating claims on behalf of the Plaintiffs – Phillip Martin's family members and Phillip Martin's estate – for the alleged violation of Phillip Martin's constitutional rights.  Defendants argue in their motions for summary judgment that the allegations in these Counts must be dismissed because a party "may only assert his own constitutional rights or immunities." Defendants argue, therefore, that Plaintiffs have no standing to vicariously assert violations of someone else's, i.e. Phillip's, constitutional rights.  In addition, Defendants argue that to the extent the claims are made by the estate on behalf of Phillip Martin, the claims also must be dismissed because a person's constitutional rights cannot be violated after that person is dead.  Defendants argue that even if Plaintiffs had adduced any evidence to support their allegations (which Defendants interpreted as stating a claim for conducting the investigation into Phillip Martin's death and his autopsy in a substandard and/or racially discriminatory fashion) there would still be no cause of action because it is undisputed that all of the Defendants named in this Count only made contact with Phillip Martin, if at all, after he had died.  In other words, because constitutional rights cannot be violated after death, and Defendants only came into contact with the decedent after his death, the claims must be denied.

Plaintiffs did not address these arguments in their opposition to Defendants' motions, and instead Plaintiffs asserted several interpretations of these claims that were,

at best, not immediately evident from the language in the Complaint.  For example, Count Two as alleged against Dr. Feigin seems to be predicated on the allegation that he conducted a racially discriminatory autopsy.  However, Plaintiffs did not offer any evidence of a racially discriminatory autopsy in their opposition to Defendants' motion for summary judgment, and instead seem now to be claiming that Dr. Feigin's alleged practice of not ordinarily appearing personally at the scenes of suicides unless requested to do so by a prosecutor is evidence that Dr. Feigin discriminated against victims of suicide in violation of the Equal Protection Clause.  Plaintiffs also newly assert in their opposition briefs that the non-Federal Defendants are liable under § 1983 for conspiring to violate Plaintiffs' constitutional rights.  In addition, Plaintiffs assert that the non-Federal Defendants are liable under § 1983 for depriving Plaintiffs' of their protected "liberty interests" in "an independent manner of death investigation", meaningful access to the courts, and a continuing relationship with their family member.  Finally, Plaintiffs assert that the municipalities of Camden City and Camden County are also liable under § 1983 for their deliberate indifference to the Constitutional rights of their citizens.

Conveniently for Plaintiff, if recognized by the Court, these additional claims would have the effect of allowing the Plaintiffs to side-step Defendants' standing arguments and those based on the fact that none of the non-Federal Defendants made contact with Phillip Martin before he died; whereas Plaintiffs' claims as stated in the Complaint seem to be aimed at the allegedly discriminatory practices of Dr. Feigin, as well as at the non-Federal Defendants' conduct towards Phillip Martin, if any, before he died, Plaintiffs' new arguments are aimed at vindicating alleged violations of all of the Plaintiffs' constitutional rights that took place after Phillip Martin died.  Nevertheless, for

the reasons explained below, even considering Plaintiffs' new arguments, Defendants are entitled to judgment as a matter of law on both Counts Two and Four.

First, Defendants are correct in asserting that all of the Plaintiffs, except Linda Martin acting on behalf of Phillip Martin's estate, have no standing to assert claims for violations of Phillip Martin's constitutional rights.   *See U.S. v. Raines*, 362 U.S. 17, 22 (1960).  Therefore, to the extent that Counts Two and Four assert claims for the non-Federal Defendants' role in Phillip Martin's death, summary judgment in favor of Defendants is appropriate.  In addition, summary judgment in favor of the non-Federal Defendants is also appropriate to the extent that these claims are being asserted on behalf of Phillip Martin's estate for the non-Federal Defendants' conduct because there has been no evidence presented that any of these Defendants made contact with Phillip Martin before he died, and a person's constitutional rights cannot be violated after death.  *See Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980); *see also Kollar v. Lozier*, 286 N.J. Super, 462, 475 (App. Div. 1996).  These principles apply to the Equal Protection claim asserted against Dr. Feigin as well; to the extent that the Equal Protection claim is being asserted on behalf of Phillip Martin, it cannot be asserted by his family members, and even as asserted by his estate the claim fails because it stems from the autopsy and Phillip's rights could not have been violated after his death.[26]

Second, even to the extent that the various claims subsumed in Counts Two and Four may be considered as having been asserted by Plaintiffs for the violation of their own constitutional rights, they still cannot survive summary judgment.  The Third Circuit has enunciated certain pleading standards for § 1983 actions, which clearly are not met

---

[26] In addition, Plaintiffs have not shown that "victims of alleged suicide" are a class subject to protection.

here.  *Colburn*, 838 F.2d at 666.  Even if the claims had been plead properly, Plaintiffs have failed after extensive discovery to produce evidence supporting their § 1983 claims.

### 1.        Deprivation of Plaintiffs' "Liberty" Interests

As stated above, Plaintiffs now argue that Defendants are liable under § 1983 for the state's unlawful breach of Plaintiffs' familial relationships and for the state's deficient investigation into the cause of Phillip Martin's death.  Under these theories, the state actors would allegedly be liable for violating the Plaintiffs constitutional liberty interests in their continued familial relationships with Phillip Martin, and for violating Plaintiffs' liberty interests in an independent manner of death investigation and in open access to the courts.  As already explained, Plaintiffs' recasting of their § 1983 claims as described seems to be designed to get around the standing arguments asserted by Defendants; Plaintiffs' new 1983 theories frame the claims as ones asserted by the Plaintiffs on behalf of themselves – rather than on behalf of Phillip Martin.

Plaintiffs cite *Bell v. City of Milwaukee* for the proposition that parents have a constitutionally protected liberty interest in association with their children such that parents can recover under § 1983 for a state's allegedly unlawful breach of the parent child relationship (i.e., the state's causing of the child's death).  *See* Opp. Br. to Fed. Def., at 32-33 (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1244 (7th Cir. 1984)).  However, the *Bell* case upon which Plaintiffs rely for this proposition has been overruled on exactly this point.  *See Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005) (overruling *Bell*).  Similarly, in Third Circuit cases and cases that have not been overruled, the law is clear that parents – and by extension, other family members – may not proceed on this theory.  *See, e.g.*, *McCurdy v. Dodd*, 352 F.3d 820, 830 (3d Cir. 2003) ("we hold that the

fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child"). So Counts Two and Four cannot proceed to the extent that they are based on a violation of Plaintiffs' rights to the companionship of Phillip Martin. In addition, even if such a claim could proceed as a matter of law, there is no evidence that any Defendant – let alone the non-Federal Defendants – caused the death of Phillip Martin.

With respect to the "independent manner of death investigation" and "access to courts" arguments, Defendants are also entitled to judgment as a matter of law. First, Plaintiffs cite no basis whatsoever for their assertion that they have a constitutional right to an independent manner of death investigation or that they have a constitutional right to a better investigation into Phillip Martin's death than that which was conducted.[27] Neither has the court found any basis in the law for Plaintiffs' contentions.

However there is some basis in the law for § 1983 claims based on a denial of meaningful access to courts, and the Court now considers Plaintiffs' 1983 claims under that theory. "The right of access to the courts . . . is founded in the Due Process Clause

---

[27] Many of these arguments sound in tort. Plaintiffs cite to numerous state regulations regarding the duties of police and medical examiners in conducting investigations and autopsies, and then Plaintiffs assert that their constitutional rights have been violated by virtue of the Defendants having failed to abide by the regulations. To the extent that those regulations created a duty owed to Plaintiffs, the breach of that duty may arguably support a negligence action, but any negligence claims in this suit are barred by Plaintiffs' failure to abide by the requirements of the FTCA and of the New Jersey Tort Claims Act. In addition, state law rights are not enforceable under § 1983. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Voyticky v. Village of Timberlake*, 412 F.3d 669, 678 (6th Cir. 2005) (intentional infliction of emotional distress does not itself give rise to § 1983 constitutional claim). In addition, violations of state constitutional rights are not enforceable under § 1983. *See, e.g.*, *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005). When governmental conduct is not proscribed by a textually explicit provision of the Bill of Rights, the Supreme Court has generally rejected substantive due process protections and left the plaintiff to available state tort remedies. *See, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 129-30 (1992) (safe working conditions); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201-02 (1989) (protection of children from parental abuse).

and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). As the Third Circuit has noted, "cover-ups that prevent a person who has been wronged from vindicating his rights violate the right of access to the courts protected by the substantive due process clause." *Estate of Smith v. Marasco*, 318 F.3d 497, 511 (3d Cir. 2003) (citations omitted*).*

In *Christopher v. Harbury*, 536 U.S. 403, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim of right to access to the courts. Specifically, the Supreme Court held that, in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint: 1) a non-frivolous, underlying claim; 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit. *Christopher*, 536 U.S. at 415. The Court explained that the first requirement mandated that a plaintiff specifically state in the complaint the underlying claim in accordance with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure to the same degree as if the underlying claim was being pursued independently. *Christopher*, 536 U.S. at 417. In this regard, the statement must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "the 'arguable' nature of the underlying claim is more than hope." *Id.* The second requirement requires a Plaintiff to clearly allege in the Complaint the official acts that frustrated the underlying litigation. Third, a Plaintiff must specifically identify a remedy that may be awarded as recompense

in a denial-of-access case that would not be available in any other future litigation.  *Id.* at 414.  Here, Plaintiffs have failed to identify any legal action they were unable to pursue as a result of Defendants' alleged actions, i.e., Defendants' alleged cover up or their allegedly deficient investigation.  To the extent that Plaintiffs are alleging that the cover-up or deficient investigation affected the instant lawsuit, Plaintiffs have not specifically identified any claims that were lost or rejected due to the alleged interference. Accordingly, Plaintiffs have not established actual injury and Defendants are entitled to summary judgment on this theory.  *Accord Dunbar v. Barone*, 487 Fed. Appx. 721, 2012 WL 2775024 (3d Cir. 2012).

### 2.    Monell Claims

Plaintiffs also assert in their opposition briefs that Camden City and Camden County are liable under § 1983.  A municipality cannot be held liable under Section 1983 for the actions of its agents or employees under a theory of respondeat superior.  *Groman v. City of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).  To establish a Section 1983 cause of action against a municipality for failure to train, supervise, investigate, or discipline its police officers, the plaintiff must show that the municipality was deliberately indifferent to the constitutional rights of its inhabitants.  *Groman*, 47 F.3d at 637; *see Tobin v. Badamo*, 78 F. App'x 217, 219 (3d Cir. 2003) ("A municipality may be held liable under section 1983 when its failure to supervise police officers reflects a policy of deliberate indifference to constitutional rights." (citations and internal quotation marks omitted)).  In addition, "[w]hen a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the

governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d
966, 971 (3d Cir. 1996) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S.
658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).  Here, Plaintiffs have clearly not shown
that either Camden City or Camden County promulgated a "policy" as understood by
*Monell*.  However, short of an official "policy," "[a] course of conduct is considered to be
a 'custom' when, though not authorized by law, such practices of state officials are so
permanently and well-settled as to virtually constitute law." *McTernan v. City of York*,
564 F.3d 636, 658 (3d Cir. 2009) (citations, internal quotation marks, and brackets
omitted).  "Custom requires proof of knowledge and acquiescence by the decision-
maker." *Id.*  Finally, "[a] plaintiff bears the burden of proving that the municipal practice
was the proximate cause of the injuries suffered." *Bielevicz v. Dubinon*, 915 F.2d 845,
850 (3d Cir. 1990).  To do so, "a plaintiff must demonstrate a 'plausible nexus' or
'affirmative link' between the municipality's custom and the specific deprivation of
constitutional rights at issue." *Id.* (citations omitted).

   Although it is highly doubtful here that the Plaintiffs have shown that there is a
genuine dispute as to whether the Defendants have promulgated a policy or custom as
understood by *Monell*, the municipal liability claims fail for the simple reason that
Plaintiffs cannot show that the alleged failures to train and supervise employees were the
proximate causes of any constitutional violations, or that there is any "plausible nexus . . .
between the municipalit[ies'] custom[s] and the specific deprivation of constitutional
rights at issue." *Id.*  Although Plaintiffs have alleged that a number of constitutional
violations occurred, the only alleged violation that survives Defendants' summary
judgment motions is the 4th Amendment claim for the unlawful seizure of Dwayne and

Linda Martin.  Plaintiffs' "failure to train" allegations do not encompass an allegation that either of the municipalities' alleged policies or customs – inadequate investigatory and crime scene training – led to Linda and Dwayne's seizure.  To sustain a § 1983 claim for municipal liability, the plaintiff must "establish a municipal custom coupled with causation, i.e. that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."  *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir.1990).  Plaintiffs have not even alleged that that the municipalities failed to properly train employees as to proper seizures under the 4th Amendment, or did so in a manner evincing deliberate indifference, and nothing in the record at this stage in the litigation demonstrates that fact even if the allegation had been made.

### 3.    Conspiracy

Further, Plaintiff has not stated a viable §1983 conspiracy claim against any of the Defendants.  Plaintiffs use the term "conspiracy" repeatedly throughout the briefs, but the charges amount to bare conclusory allegations of a § 1983 conspiracy, which are inadequate to state a cognizable conspiracy claim.  *See Flanagan v. Shively*, 783 F. Supp. 922, 928-29 (M.D. Pa. 1992), aff'd. 980 F.2d 722 (3d Cir. 1992), cert. denied 510 U.S. 829, 114 S. Ct. 95, 126 L. Ed. 2d 62 (1993).  "The Plaintiff's allegations [of conspiracy] must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role each Defendant allegedly played in carrying out those objectives. Bare conclusory allegations of 'conspiracy' . . . will not suffice to allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred."  *Id.* at 928.

In order to prevail on a conspiracy claim under § 1983, Plaintiffs must prove that persons acting under color of state law conspired to deprive them of a federally protected right. *See White v. Brown*, 408 Fed. Appx. 595, 599 (3d Cir. 2010) (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 254 (3d Cir. 1999)). The grant of summary judgment is proper on such a claim where a plaintiff cannot establish an underlying violation of any constitutional rights. *See id; see also Young v. County of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) ("There was no deprivation of a federal constitutional right, and therefore there can be no civil rights conspiracy to deprive that right."). Here, the only allegation of a violation of a federal constitutional right that survives summary judgment is that of the unlawful detention of Linda and Dwayne. Plaintiffs have offered no evidence of any agreement among Defendants to deprive them of a constitutional right, let alone of an agreement to unlawfully detain Linda and Dwayne Martin. "[I]t is not enough . . . that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Prince v. Aiellos*, No. 09-5429 (JLL), 2010 WL 4025846, at *7 (D.N.J. Oct. 12, 2010). Rather, the plaintiff bears the burden of showing that the alleged conspirators "reached an understanding, or had a 'meeting of the minds' to violate his rights." *Phillips*, 2011 WL 817166, at *11(citation omitted). A plaintiff may not rely on "his own suspicion and speculation" to meet this burden. *Young v. Kann*, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991). Here, Plaintiffs rely on nothing more than speculation that there was an agreement among Defendants to violate their constitutional rights. Therefore, summary judgment is appropriate.

Accordingly, all of Plaintiffs' § 1983 claims in Counts Two and Three will be

dismissed, except for the 4th Amendment claim in Count Two for the unlawful detention of Linda and Dwayne Martin by the Camden City Defendants and Defendant McBride.

## VI.    Counts Four and Six: New Jersey Civil Rights Act and New Jersey Constitutional Claims as to Non-Federal Defendants

Count Four, subtitled "Violations of the New Jersey Civil Rights Act," alleges that the "above listed law enforcement officers of Camden county and the [Camden City Police Department]" are liable under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, et seq., "because of [their] unlawful actions," and that Dr. Feigin is liable under the CRA "because of his sub-standard work and discriminatory intent."  This Count seems to assert that Defendants' violated the New Jersey Civil Rights Act by virtue of the same conduct which was alleged to have violated § 1983 in Count Two.   Count Six, subtitled "Violations of NJ Constitution, Article I, Section 7," alleges that "defendants" are liable to the estate of Phillip Martin for excessive use of force and to Linda and Dwayne Martin for "unlawfully entering and searching the family home; for unlawfully arresting them; and for their unlawful false imprisonment."   This Count seems to assert that Defendants violated the New Jersey Constitution by virtue of the same conduct which was alleged to have violated the Fourth Amendment to the Federal Constitution in Count Three.   In addition, it should be noted that civil claims for violations of the New Jersey Constitution can only be asserted by way of the New Jersey Civil Rights Act.  Accordingly, Count Six will be dismissed, and any alleged violations of the New Jersey Constitution will be analyzed under Count Four as a violation of the New Jersey Civil Rights Act.

As Defendants argue, the New Jersey Civil Rights Act is interpreted analogously to 42 U.S.C. § 1983.  *See Hottenstein v. City of Sea Isle City*, 2011 WL 3651302 (D.N.J. Aug. 18, 2011).  In addition, "[t]he standard for probable cause is identical under federal

and New Jersey law." *Schirmer v. Penkethman*, Civ. No. 10-1444, 2012 U.S. Dist. LEXIS 182901, 2012 WL 6738757, *8 (D.N.J. Dec. 31, 2012) (citing *Maples v. City of Atl. City,* Civ. No. 06-2200, 2008 U.S. Dist. LEXIS 47681, 2008 WL 2446825, *6 (D.N.J. June 16, 2008); *New Jersey v. Basil*, 202 N.J. 570, 998 A.2d 472 (N.J. 2010) (reciting standard for probable cause to arrest under New Jersey law and citing to federal law as the basis for that standard)).   And nowhere in the Complaint or in Plaintiffs' briefs or oral argument in opposition to the motions for summary judgment did Plaintiffs identify any specific right or theory of liability grounded in the New Jersey Civil Rights Act or New Jersey Constitution that is different from Plaintiffs' claims under § 1983. Accordingly, the Court will resolve the motions for summary judgment on Count Four in the same manner it resolves the motions for summary judgment on Count Three; the Court will grant Defendants' motions as to all Defendants on the majority of claims under Count Four for the same reasons the motions are being granted on Count Three, and denies the motions as to defendants William Wiley, Wayne Matthews, Keith James, James Phillips, and Gary McBride on Linda and Dwayne Martin's false arrest and unlawful detention claims under Count Four for the same reasons the motions are being denied with respect to Count Three.

## VII.    Count Seven: Non-Federal Defendants

The Court has already discussed, *supra,* Linda Martin's March 8, 2008 letter with respect to the FTCA's requirements, and now reviews the letter in the context of Plaintiffs' state law negligence claims.   Count Seven of Plaintiffs' Complaint is a tort claim against "defendants" generally for breaching a duty to Phillip Martin to use reasonable efforts in the conduct of their duties to avoid unnecessary harm and

proximately causing Martin's death.  The claim is plead under the New Jersey wrongful death and survival action laws, N.J.S.A. 2A:31-1 and 2A:15-3.  Although not specifically designated as a negligence count, the factual and legal allegations throughout the Complaint and specifically in Count Seven are that Defendants did not perform an adequate investigation into the death of Phillip Martin and that Defendants breached a duty to Martin in failing to adequately protect him in some manner.  *See* Complaint ¶¶ 143-147.  Because no tort claim notice was submitted by Plaintiffs, Count Seven will be dismissed.

As the negligence claim is necessarily a state law claim, the Court applies New Jersey substantive law governing negligence.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Under the New Jersey Tort Claims Act, an individual may not sue a public entity or public employee unless he provides the entity or employee with a pre-suit notice of the claim.  N.J.S.A. 59:8-3.  Notices of claim must "at the very minimum" be in writing.  *Velez v. City of Jersey City*, 358 N.J. Super. 224, 238 (App. Div. 2003), *aff'd*, 180 N.J. 284 (2004).  The notice must be presented no later than ninety days after the accrual of the action and must provide specific information about the claimant and his injury.  *See* N.J.S.A. 59:8-4 and 8-8.  Here, the date of accrual of Plaintiffs' claims is immaterial, because Plaintiffs never filed a notice of the claim as required.  A notice of claim must contain: the claimant's name and address; the address to which the claimant wants notices to be sent; the date, place, and other circumstances of the occurrence giving rise to the claim; a description of the injury, damage or loss incurred; the name of the public entity or employee causing the injury, damage or loss, if known; and the amount claimed.  *See* N.J.S.A. 59:8-4.  The notice of claim requirement applies equally to claims

against public entities and claims against public employees.  *See e.g.*, *Dunn v. Borough of Mountainside*, 301 N.J. Super. 262, 276 (App. Div. 1997); *Serrano v. Gibson*, 304 N.J. Super 314, 318 (App. Div. 1997).  The failure to comply with the Act's notice of claim provisions is an absolute bar to recovery.  N.J.S.A. 59:8-8; *see also Karczewski v. Nowicki*, 188 N.J. Super 355, 357 (App. Div. 1982).

Here, Plaintiffs have failed to provide any of the Defendants with a notice of claim.  Although Plaintiffs argue that Linda Martin's March 28, 2008 letter satisfied the notice of claim requirement, it did not.  Among other reasons it fails to comply with the statute's requirements, the letter does not specify the amount claimed.  The letter does not even provide notice that the Martins intended to seek money damages; rather, it merely complains about the conduct of various law enforcement officers and asks for information about what occurred.  Plaintiffs also never sought permission for leave to file a late notice of claim, which they could have done within a year of accrual of the claim under N.J.S.A. 59:8-9.  Absent a proper notice of claim or a claim filed with leave from the Court within a year as provided, the Court lacks jurisdiction to allow Plaintiffs to proceed on the negligence claims.  *Iaconianni v. N.J. Turnpike Auth.*, 121 N.J. 592 (1990).[28]

**CONCLUSION**

For the reasons stated above, Defendants' motions for summary judgment are granted except with respect to Plaintiffs' narrow claims under Counts Three and Four , regarding the unlawful detention of Linda and Dwayne Martin by the individual Camden

---

[28] In addition, Count Seven should be dismissed as to Defendant Feigin because it includes professional negligence allegations against him.   An "affidavit of merit" is required to be provided to defendants within sixty days after filing the answer under N.J.S.A. 2A:53A-27.  Plaintiffs never supplied any of Defendants with an "affidavit of merit".

City Defendants and by Defendant Gary McBride of the Camden County Prosecutor's Office.  Accordingly, the rest of the claims, including all of the claims asserted against the Federal Defendants, are dismissed with prejudice.  With respect to the remaining claims, the Court denies summary judgment without prejudice.  It appears that the parties' attention in briefing the motions for summary judgment was focused primarily on the excessive force and conspiracy claims.  In addition, there was much confusion apparent in the briefing about exactly what actions of Defendants', Plaintiffs' various causes of action were directed at.  Having narrowed the issues by granting summary judgment on the majority of the claims, the Court will, in the interests of justice and efficiency, give the parties thirty days within which to file additional motions for summary judgment on the narrow issues that remain before proceeding to trial.  The Court will issue an appropriate order.


August 14, 2013                           s/Peter G. Sheridan_____
                                          PETER G. SHERIDAN, U.S.D.J.